COMMONWEALTH *vs.* ISRAEL GONSALEZ CRUZ.

Middlesex.    September 13, 1977. — November 17, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Constitutional Law,* Admissions and confessions, Probable cause. *Admissions and Confessions. Arrest. Probable Cause. Practice, Criminal,* Trial of indictments together. *Evidence,* Hearsay.

With respect to a defendant indicted for arson and murder, there was no reversible error in the denial of his pre-trial motion for suppression of incriminating statements and confessions made at a police station, where a conclusion was warranted that his detention comported with requirements of the Fourth Amendment to the United States Constitution, in that the circumstances clearly warranted the conclusion that the defendant was detained with probable cause, on facts known to the police at the time he entered a police cruiser after being seen at three fires related in time and location, or in that the defendant had accompanied the police officers to the station voluntarily, and then, while "in custody" but under no restraint or compulsion, made implausible and evasive statements which, when coupled with his having been discovered in an alley behind the scene of the third fire, gave the police probable cause after the defendant's

first hour at the station to detain him for further questioning. [681-685]

With respect to a defendant indicted for arson and murder, there was no reversible error in the denial of his pre-trial motion for suppression of incriminating statements and confessions made by him approximately four hours after arrival and commencement of interrogation at a police station and immediately before his arrest, where a conclusion was warranted that his rights under the Fifth Amendment to the United States Constitution were adequately protected, notwithstanding the absence of police repetition of previous Miranda warnings when the defendant was informed that he could not go home, where it appeared that he was fully aware of his status as a suspect, that the Miranda warnings given at the outset were both adequate and timely, that the interview was continuous, and that the defendant fully understood his legal rights and knowingly and intelligently waived them. [685-688]

No violation of the rights of an indicted defendant under the Fourteenth Amendment to the United States Constitution was demonstrated by reason of the procuring of his confession by police after an interrogation one morning from 12:30 A.M. to 4:30 A.M. at a police station, where coercion was not shown by the totality of the circumstances, including the facts that the defendant, after a conversation with relatives, came to the station voluntarily, that he was not physically restrained there, and that he was fully advised of his rights and was mentally alert and understood what was said to him. [688-689]

There was no error in the denial of the defendant's motion to sever indictments for attempted arson, for arson, and for murder in the first degree arising out of three fires closely related in time and location. [690-691]

There was no error at the trial of indictments in permitting the Commonwealth to introduce in evidence unequivocal denials made by the defendant in response to questioning by the police prior to his confession where the denials were admitted to show his "state of mind concerning the voluntariness of his confession," and were followed by the judge's careful instructions, and where any inference of guilt from the police's initial questioning and the defendant's unequivocal denials was negligible, and the questions were highly relevant to the issue of voluntariness. [691-692]

INDICTMENTS found and returned in the Superior Court on April 10, 1974.

A pre-trial motion to suppress evidence was heard by *Lynch*, J., and the cases were tried before him.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*James A. O'Donovan* for the defendant.

*James W. Sahakian*, Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J.  The defendant was tried before a Superior Court jury on indictments charging murder in the first degree, arson, and attempted arson. Before trial, the defendant moved to suppress certain statements made by him at the Lowell police station and to sever the indictment for attempted arson from the other indictments charging arson and murder. After a lengthy voir dire, the judge denied both motions. At the close of the Commonwealth's case, the trial judge allowed a motion for a directed verdict on the attempted arson indictment. On the other charges, the jury returned verdicts of guilty of murder in the second degree and arson.

The defendant appeals under G. L. c. 278, §§ 33A-33G, and argues three assignments of error:[1] (1) the denial of the defendant's motion to suppress; (2) the denial of the motion to sever; and (3) the admission in evidence of unequivocal denials made by the defendant when questioned by the police. We conclude that there was no error.

We summarize the facts as found by the judge on voir dire. On February 15, 1974, shortly after 8 P.M., a fire occurred at 909 Middlesex Street, Lowell, in a first-floor apartment. An occupant of that apartment, Fernando M. Andrades, died as a result of injuries suffered in the fire. At approximately 10:30 P.M., a second fire occurred in the same building in a second-floor apartment. Shortly thereafter, still another fire of lesser dimensions occurred at 5 Queen Street in an occupied building which was roughly diagonally across the street from the scene of the first two fires.

Several witnesses placed the defendant at the scene of each of these fires. At approximately 8:40 P.M., both Patrolman Upton and Officer Waterhouse of the Lowell police department saw the defendant at the scene of the first fire. Each man spoke to the defendant briefly during the course of their investigations. Subsequently, Officer Waterhouse

---

[1] The defendant originally made nine assignments of error, but specifically waived six in his brief on appeal.

saw the defendant standing in a crowd of people at the scene of the second fire.

Sometime after the fires at Middlesex Street, the defendant appeared at the second-floor apartment of one Michael Rivera, an occupant of the 5 Queen Street apartment building. The defendant knocked on Rivera's door, inquired about a woman, and left. Moments later, Rivera heard a noise, ran upstairs, and saw a fire in the hallway of the third floor. He then began to look into various rooms in the building. On opening a door to the basement, Rivera saw the defendant sitting in the dark at the top of the stairs. The defendant then went out the front door. Rivera followed, and saw the defendant go into an alley behind the 5 Queen Street building.

Rivera's path intercepted that of Lieutenant Burke, a fireman who earlier that evening had responded to the alarms at Middlesex Street. He saw people coming out of the Queen Street building, and was told by one of the women occupants that someone had been trying to set a fire, and that "[h]e ran into the alley." Rivera also told Burke that the defendant was in the alley, and that he, Rivera, believed that the defendant had set the fire.

When Lieutenant Burke entered the alley to investigate, the defendant announced, "Man, here I am." Burke asked the defendant if he was the one setting the fires. The defendant did not reply. He did, however, comply with Burke's request to go with him to see the fire chief. Burke accompanied the defendant to Middlesex Street, where they met Deputy Fire Chief Murphy and Officer Waterhouse. In the presence of the defendant, Burke told Murphy and Waterhouse that "[t]his is the man I found in the alley. The people in the tenement said he's starting the fires." The defendant then walked with Lieutenant Burke to Officer Upton, who called for a police cruiser.

Officers Waterhouse and Upton testified that at this time the defendant had a strong odor of alcohol on his breath. Nevertheless, the judge found that during this sequence of events and, at all times thereafter, the defendant was able to walk without assistance, that he spoke

coherently and intelligibly, and that he was sufficiently sober at all material times to understand what was said to him. The judge further found that at no time was the defendant handcuffed or placed under any physical constraint.

At Officer Upton's suggestion, the defendant and Upton waited in the cruiser until its driver, Sergeant McElroy, returned from investigating the scene. While in the cruiser, the defendant had a conversation in Spanish with his sister and brother-in-law. Shortly thereafter, and on McElroy's return, the defendant was taken to the police station for questioning.

When the defendant arrived at the station at 12:45 A.M. on February 16, 1974, he was advised in English and Spanish of his constitutional rights. A waiver of rights card was read to the defendant in English and Spanish, and he read and signed the two waiver cards at 1:20 A.M. A Spanish speaking officer, Officer Cortes, then told the defendant that he was a suspect in an arson case, and began to question him as to his involvement.

During the first hour of questioning, the defendant and Cortes discussed the defendant's relationship to the victim and discussed the defendant's whereabouts on the evening of the fires. Cortes became suspicious of the defendant's assertion that the victim was his brother, because the names of the parties bore no relationship to each other. Cortes asked the defendant two or three times whether he had set the fires, and, if he had not, whether he had any information to help the police discover who had. The defendant denied lighting any fires, but added at some point in the questioning, "I know, but I'm not going to tell you, I'm going to get him myself." Cortes impressed on the defendant the importance of revealing the identity of that person, and told him that the police would prosecute whoever was responsible. The defendant named one Jesus deJesus. At approximately 2:30 A.M., Cortes began writing in English a statement concerning the defendant's naming of deJesus, which statement was read to the defendant and signed by him at approximately 3 A.M.

Shortly after Cortes wrote the statement, deJesus arrived at the station. He responded to questions concerning his whereabouts at the time of the fires and asked to see the person claiming that he had set the fires. At approximately 4:15 A.M., the defendant was brought into the presence of deJesus. On seeing deJesus, the defendant stated that deJesus was not the one he saw lighting the fires.

After deJesus left the station, the defendant asked for the first time whether he could go home. Cortes told the defendant he could not go home, and that he wanted the truth about the fires. Shortly thereafter, the defendant told Cortes that he had attempted to light a fire at 5 Queen Street, but denied lighting the others. About fifteen minutes later, at approximately 4:45 A.M., the defendant confessed to lighting the fires on Middlesex Street. Thereafter, the defendant signed a statement prepared and read to him by Cortes, and was placed under arrest.

1. The defendant advances three arguments to support the contention that his statements made at the police station should have been suppressed. The first argument, based on the Fourth Amendment to the United States Constitution, contests the judge's conclusions that (1) the defendant's presence at the police station was voluntary; and that (2) as a result, the defendant was not legally "under arrest" until approximately 4 A.M., when he was informed by Officer Cortes that he was not free to leave. The defendant asserts that he was "in custody" from the time he was taken to the police station, and argues that this detention amounted to an arrest without probable cause.

We conclude that there was no reversible error in the denial of the motion to suppress. As will be seen below, we are unable to agree with the judge's conclusion that the entire period of questioning at the police station was voluntary, and thus noncustodial in nature. Although we now decide that the defendant was in custody after the first hour of questioning, we conclude, on two alternative grounds, that his detention at the police station comported

with requirements of the Fourth Amendment. First, the circumstances in this case clearly warrant the conclusion that the defendant was detained with probable cause, on facts known to the police at the time the defendant entered the police cruiser. Second, assuming arguendo that no probable cause existed precisely at that time, we find that the defendant accompanied the police officers to the station voluntarily, and then, while under no restraint or compulsion, made statements which, when combined with the circumstances surrounding his discovery in the alley, gave the police probable cause to detain him for further questioning. See *Commonwealth* v. *Daniels*, 366 Mass. 601, 610 (1975).

On the issue of the defendant's status during the four-hour questioning at the police station, we find ample evidence in the record to warrant the conclusion that the defendant complied voluntarily with initial requests to answer questions at the police station.[2] The defendant was not apprehended and forcibly taken into custody; rather, he announced his presence to Lieutenant Burke on his own accord, and then freely accompanied him to the police officers on duty. There is also sufficient evidence in the record to warrant a finding that the defendant consented to enter the police cruiser and to go to the station for questioning.[3] The record shows that throughout this sequence of events, the defendant was neither searched nor

---

[2] In reviewing the record on this issue "[w]e accept, as we must, the trial judge's resolution of conflicting testimony . . . , and will not disturb his subsidiary findings if they are warranted by the evidence . . . . However, ultimate findings and conclusions of law, particularly those of constitutional dimensions, are open for our independent review in this appeal" (citations omitted). *Commonwealth* v. *Mahnke,* 368 Mass. 662, 666-667 (1975), cert. denied, 425 U.S. 959 (1976). See *Commonwealth* v. *Murphy,* 362 Mass. 542, 551 (1972) (Hennessey, J., concurring); *Commonwealth* v. *Cook,* 351 Mass. 231, 235, cert. denied, 385 U.S. 981 (1966); *Commonwealth* v. *Kleciak,* 350 Mass. 679, 685-689 (1966).

[3] Consent may properly be found from the "totality of all the circumstances," even where the defendant has not been informed specifically that his consent may be withheld. *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 227 (1973).

placed under any physical constraint. He was mentally alert, understood the requests of the officers, and responded accordingly. "While we are aware of the still uncertain line of demarcation between legitimate investigation and unlawful detention of a suspect . . . , we think that it is clear that no illegal detention arises when a person, complying with a request by the police, voluntarily goes to a police station for questioning . . . ." *Commonwealth* v. *Slaney,* 350 Mass. 400, 406 (1966). See *United States* v. *Brunson,* 549 F.2d 348, 357 (5th Cir. 1977), and cases cited therein. See also *Commonwealth* v. *Daniels,* 366 Mass. 601, 610 (1975); City & others, Search and Seizure — A Symposium, 54 Mass. L.Q. 203, 223 (1969).

Yet in determining whether the defendant's freedom of action was restrained in any way during these four hours of questioning, we must look not only to the voluntariness of his arrival at the station, but also to his ability voluntarily to leave. See *Commonwealth* v. *Wallace,* 346 Mass. 9, 16 (1963); *United States* v. *Brunson,* 549 F.2d 348, 357-358 (5th Cir. 1977). On this issue, the record shows that during the first hour of questioning, the defendant was given Miranda warnings in English and Spanish,[4] and was informed that he was a suspect in an arson case. Initial questioning was clearly focused on the defendant's relationship to the victim of the first fire and on his involvement in the events of that evening. The record shows that during the first hour, the police suspected that the defendant was not answering truthfully. Also during that hour, the defendant informed the police that he knew who had set the fires, but that he would not tell them. These circumstances do not warrant the judge's conclusion that "had the defendant requested or insisted upon the right to leave [after the first hour of questioning] he would have been allowed to depart although with reluctance on the part of the police." We find the inference compelling that the defendant was *not* free to go at this time, and, as a

---

[4] The sufficiency of these warnings and the question whether the defendant waived his rights voluntarily will be discussed *infra.*

consequence, he was "in custody" in every significant sense of the term.

Although we disagree with the judge's conclusion that the defendant was not "in custody" until formally arrested, we find no infringement of the defendant's Fourth Amendment rights because we find that the police detained the defendant on probable cause. Our conclusion as to probable cause rests on the following circumstances. The defendant had been observed at the scene of all three fires by both firemen and police officers. When the third fire occurred, two occupants of the burning building independently informed an approaching fireman that the person responsible for setting the fire had run into the alley. From his own observation of the scene, Lieutenant Burke had ample ground for believing that a fire had in fact occurred. The crucial link between the unsolved arson and the defendant was provided by informants whose reliability was ensured by their status as victims of the offense. *Nelson* v. *Moore*, 470 F.2d 1192, 1197 (1st Cir. 1972). See *United States* v. *Anderson*, 533 F.2d 1210, 1213 (D.C. Cir. 1976); *Pendergrast* v. *United States*, 416 F.2d 776, 785 (D.C. Cir. 1969). Their identical stories were then independently corroborated by Lieutenant Burke, who found the defendant in the alley, where the defendant volunteered, "Man, here I am."[5]

Applying the rule that, when engaged in a cooperative effort, the knowledge of one officer is the knowledge of all,

---

[5] Further corroboration by Lieutenant Burke lends an additional element of reliability to the informants' "tip." In *Commonwealth* v. *Stevens*, 362 Mass. 24, 26-27 (1972), this court recognized that, generally speaking, credibility is established by meeting the two-pronged test of *Aguilar* v. *Texas*, 378 U.S. 108, 112-116 (1964): (1) that there are underlying facts and circumstances indicating the informant's reliability; and (2) that there are underlying facts and circumstances on which the informant bases his information that the defendant is engaged in criminal activity. However, we also found that an arrest may be upheld where the informant's tip fails to meet this two-pronged test, "provided that the tip is sufficiently corroborated by other sources." For example, "observation by police officers of suspicious acts of the defendant may constitute sufficient corroboration of the tip." *Commonwealth* v. *Stevens, supra* at 27.

*Commonwealth* v. *Riggins,* 366 Mass. 81, 88 (1974); *Commonwealth* v. *Lanoue,* 356 Mass. 337, 340 (1969); *Commonwealth* v. *McDermott,* 347 Mass. 246, 249 (1964), we find that the facts known to the police at this time constituted more than a "bare suspicion" that the defendant was involved in setting the fires. *Brinegar* v. *United States,* 338 U.S. 160, 175 (1949). These facts and circumstances amply warranted the police in concluding that it was "more probable than not" that the defendant had committed the offense. *Commonwealth* v. *Haas, ante,* 545, 567-568. (1977) (Hennessey, C.J., dissenting in part). Cf. *Commonwealth* v. *Snow,* 363 Mass. 778, 788 (1973); *Brinegar* v. *United States,* 338 U.S. 160, 175-176 (1949).

Even if these facts were not in and of themselves sufficient to warrant a prudent person, applying a more probable than not standard, in believing that the defendant had committed the offense, we find that initial statements made by the defendant at the police station supplied additional facts which, when added to the above, clearly warranted further detention. During the first hour of questioning, a time when the defendant can clearly be found to have been present voluntarily (see discussion *supra*), the defendant offered implausible explanations of his relationship to the victim of the first fire, told the police that he knew who had set the fire, and then refused to identify the person responsible. Such evasive replies, coupled with the unusual circumstances of his discovery in the alley, clearly provided the police with probable cause to detain the defendant further. See *Commonwealth* v. *Riggins,* 366 Mass. 81, 88 (1974); *Commonwealth* v. *Chaisson,* 358 Mass. 587, 590 (1971).

The defendant next argues that incriminating statements made by him at the police station should have been suppressed on Fifth Amendment grounds. The defendant, rightfully, does not challenge the judge's finding that complete Miranda warnings were carefully given and fully understood by him at the outset of the questioning.[6] Nor

---

[6] The record shows that at approximately 12:45 A.M., before any questions were asked of the defendant, Inspector Myers identified him-

Commonwealth *v.* Cruz.

does he argue that the statements given before his confession were involuntarily made.[7] Rather, according to the defendant, the judge erred when he found that at the time the defendant was informed he was not free to leave, "it was not legally necessary . . . nor [*sic*] required for the police to repeat . . . the Miranda warnings which had already been given fully both in English and Spanish to the defendant and fully comprehended by him." Relying heavily on *Commonwealth* v. *Murray,* 359 Mass. 541 (1971), the defendant argues that the earlier Miranda warnings were not sufficient to keep him apprised of his rights during the interrogation, particularly after 4:30 A.M., when the judge found that the defendant was "in custody." Additionally, the defendant asserts that if his status did change from noncustodial to custodial at approximately 4:30 A.M., he was not aware of that fact. According to the defendant, the police's failure to disclose this significant fact negated his previously valid waiver.

We reject the defendant's Fifth Amendment claims. First, it is clear from the record that the defendant was

---

self to the defendant and advised him in English of his Miranda rights. The defendant said that he understood his rights. At approximately 1:10 A.M., Officer Cortes again gave the defendant Miranda warnings, this time in Spanish. After Cortes recited the warnings, he gave the defendant a card on which the Miranda warnings were printed in Spanish. The defendant read the card and told Officer Cortes that he understood his rights. Officer Myers then read to the defendant a waiver of rights form. The defendant read and signed duplicate waiver of rights forms without difficulty. The judge found "from personal observation during the hearing on the motions to suppress that despite his testimony tending somewhat to the contrary the defendant is in fact able to understand spoken English with considerable facility, and that he is able to read English at least to the extent that he can understand the substance of what he sees."

[7] The judge found that the defendant "understood his right to remain silent, to have an attorney present if he wished one. . . . [W]hile . . . [the defendant] had consumed intoxicating liquors earlier that day and in the evening, he was not then drunk or otherwise so intoxicated . . . as to be unable to understand his situation or to make intelligent decisions. . . . [I]n the totality of the circumstances . . . he made a conscious, voluntary, intelligent decision to remain at the station house and to answer questions, . . . and that he voluntarily, intelligently and knowingly made statements to the police . . . ."

fully aware of his status as a suspect at the police station. The defendant was in the presence of police officers when they were initially informed by Lieutenant Burke that the defendant may have been involved in the fires. After Miranda warnings were read to the defendant, he was explicitly informed by Officer Cortes that he was a suspect. When the defendant asked Officer Cortes, at approximately 4:30 A.M., whether he could return home, he was explicitly told that he was not free to leave the station. Thus, although urged to do so by the defendant, we do not reach the questions confronting the court in *Commonwealth* v. *McKenna,* 355 Mass. 313, 324 (1969), where the police failed to inform the defendant that his attorney had called, and then, notwithstanding the attorney's request to be present, allowed the defendant to make inculpatory statements. Here, no such significant facts remained undisclosed.

Second, the Miranda warnings given to the defendant at the outset of police questioning were both adequate and timely. We recognize that "*Miranda* warnings, once given, are not to be accorded unlimited efficacy or perpetuity." *United States* v. *Hopkins,* 433 F.2d 1041, 1045 (5th Cir. 1970). Generally, when there has been a significant lapse of time between initial Miranda warnings and inculpatory statements, "the ultimate question is: Did the defendant, with a full knowledge of his legal rights, knowingly and intentionally relinquish them?" *Miller* v. *United States,* 396 F.2d 492, 496 (8th Cir. 1968). *United States* v. *Standing Soldier,* 538 F.2d 196, 201 n.5 (8th Cir. 1976). *Evans* v. *Swenson,* 455 F.2d 291, 297 (8th Cir. 1972). Cf. *Commonwealth* v. *Valliere,* 366 Mass. 479, 487 (1974); *Roy* v. *Hall,* 521 F.2d 120, 123-124 (1st Cir. 1975).

Here, we find no significant lapse of time between the warnings and the interrogation, and the questioning was not conducted at separate interviews.[8] See *Commonwealth*

---

[8] Contrary to the defendant's claims, this case is distinguishable from *Commonwealth* v. *Murray,* 359 Mass. 541, 545 (1971), where there was a two-day interval between initial warnings and the interview at which the inculpatory statements were made.

v. *Valliere, supra* at 487 (initial Miranda warnings found sufficient to support a waiver of approximately four hours). Cf. *Evans* v. *Swenson, supra* at 297 (Miranda warnings given before the defendant was taken to the police station found sufficient to support a waiver of rights at the police station). Further, there is ample evidence in the record to warrant the inference that the defendant fully understood his legal rights, and knowingly and intelligently waived them.[9] Thus, the defendant's Fifth Amendment rights were adequately protected.

The defendant finally asserts that, because his confession was a product of the all-night interrogation at the police station, its use at trial deprived him of his right to due process of law under the Fourteenth Amendment. The determination whether a confession has been coerced, and thereby extracted in violation of Fourteenth Amendment rights, involves essentially the same inquiry into "voluntariness" required under the *Miranda* rule.[10] The question is "whether the will of the defendant had been overborne so that the statement was not his free and voluntary act, and that question [is] to be resolved in light of the totality of the circumstances." *Procunier* v. *Atchley*, 400 U.S. 446, 453 (1971). *Commonwealth* v. *Mahnke*, 368 Mass. 662, 679 (1975). Further, while we do not disturb the judge's findings of fact where warranted by the evidence, "[i]t is our duty in ... cases dealing with the question whether a confession was involuntarily given, to examine the entire record and make an independent determination of the ultimate issue of voluntariness." *Davis* v. *North Carolina*, 384 U.S. 737, 741-742 (1966). See *Commonwealth*

[9] See notes 6 and 7, *supra*.

[10] Indeed, after *Miranda* v. *Arizona*, 384 U.S. 436 (1966), the Fourteenth Amendment voluntariness standard has generally been applied only where the Fifth Amendment Miranda standard is clearly inapplicable. *Commonwealth* v. *Mahnke*, 368 Mass. 662, 679 (1975) (confession made to private individuals rather than to law enforcement officers). *Delle Chiaie* v. *Commonwealth*, 367 Mass. 527, 532-533 (1975) (confession made to police prior to the time that the Miranda ruling took effect). See *Procunier* v. *Atchley*, 400 U.S. 446, 453 (1971); *Davis* v. *North Carolina*, 384 U.S. 737, 740 (1966).

v. *Mahnke, supra* at 723-725, 726 (Hennessey, J., dissenting). See also note 2, *supra.*

We conclude that there was no error in the judge's finding that the defendant's confession was voluntary. While the fact that the defendant was questioned from approximately 12:30 to 4:30 A.M. is certainly relevant in determining the ultimate voluntariness of his confession (see *Commonwealth* v. *Makarewicz,* 333 Mass. 575, 587 [1956]), we are satisfied that the judge's finding of voluntariness is warranted "from the totality of the circumstances." The defendant came to the station voluntarily, and, while there, was not physically restrained in any way. See generally *Watts* v. *Indiana,* 338 U.S. 49, 53 (1949); *Chambers* v. *Florida,* 309 U.S. 227, 230 (1940); *Brown* v. *Mississippi,* 297 U.S. 278, 286 (1936). He was fully advised of his rights to remain silent, to make a telephone call, and to have an attorney present. See generally *Davis* v. *North Carolina,* 384 U.S. 737, 739-741 (1966); *Haynes* v. *Washington,* 373 U.S. 503, 510-511 (1963); *Spano* v. *New York,* 360 U.S. 315, 322-323 (1959); *Haley* v. *Ohio,* 332 U.S. 596, 598 (1948). He was not held "incommunicado."[11] See generally *Fikes* v. *Alabama,* 352 U.S. 191, 197 (1957); *Ashcraft* v. *Tennessee,* 322 U.S. 143, 154 (1944); *Chambers* v. *Florida,* 309 U.S. 227, 230 (1940). His statements were not procured by the police through trickery or deceit. See generally *Spano* v. *New York, supra* at 323.

There is ample evidence to warrant the judge's finding that at all times the defendant was mentally alert and understood what was said to him. Further, the evidence supports the judge's conclusion that "at no time did the defendant . . . ask to leave the station, ask to lie down, lie down, fall asleep, become ill or nauseated, complain in any manner of mistreatment, exhibit any manifestations of the D.T.'s, or hallucinations, or ask for food or drink." The totality of the circumstances do not show that the confession was coerced.

---

[11] Before the defendant was driven to the station, he had a conversation with his sister and brother-in-law. They were aware that he was being questioned by the police.

2. There was no error in the judge's denial of the defendant's motion to sever. As a general rule, "the decision whether to allow a motion to sever two or more indictments which have been joined for purposes of trial rests in the sound discretion of the trial judge." *Commonwealth* v. *Jervis,* 368 Mass. 638, 645 (1975). See *Commonwealth* v. *Beneficial Fin. Co.,* 360 Mass. 188, 223 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts,* 407 U.S. 910, and sub nom. *Beneficial Fin. Co.* v. *Massachusetts,* 407 U.S. 914 (1972); *Commonwealth* v. *Fancy,* 349 Mass. 196, 204 (1965); *Commonwealth* v. *Iannello,* 344 Mass. 723, 727 (1962). The legal standards which must guide the exercise of this discretion have been articulated by this court as follows: "No sound reason can be given why several indictments charging different crimes arising out of a single chain of circumstances should not be tried together. Where several offenses might have been joined in one indictment, and would be proved by substantially the same evidence, or evidence connected with a single line of conduct, and grow out of what is essentially one transaction, and where it does not appear that any real right of the defendant has been jeopardized, it would be a refinement not demanded by the law or by justice to require in all instances a separate trial, simply because separate indictments have been found for each offense." *Commonwealth* v. *Blow,* 362 Mass. 196, 200 (1972), quoting from *Commonwealth* v. *Rosenthal,* 211 Mass. 50, 54 (1912). See *Commonwealth* v. *Maloney,* 348 Mass. 610, 613 (1965); *Commonwealth* v. *Slavski,* 245 Mass. 405, 411-412 (1923). The question in each case is simply whether "the separate offences would be proved by 'evidence connected with a single line of conduct, and grow out of what is essentially one transaction.'" *Commonwealth* v. *Maloney, supra* at 614.

Here, the separate acts with which the defendant is charged were closely related in time and space and were of the same general nature. Contrast *Commonwealth* v. *Blow,* 362 Mass. 196 (1972). As such, the judge could properly have concluded that the separate offenses of attempted arson and arson/murder grew essentially out of the same line of conduct. Further, the circumstantial evi-

dence of the defendant's whereabouts on the evening of the fires, the circumstances of his discovery by Lieutenant Burke, and the defendant's own statement concerning his activities on the evening in question implicate the defendant in both the Middlesex Street and Queen Street fires. Thus, the judge could properly have found that the separate offenses with which the defendant was charged were "supported by similar evidence." *Commonwealth* v. *Blow, supra* at 200. Last, it is clear that even if the indictments had not been tried together, evidence of the defendant's connection with the other related incidents would undoubtedly have been relevant and admissible at the trial of any one of the indictments. Since the several fires were so closely related in time and location, any reasonably complete presentation of the events of that evening and the defendant's conduct, with respect to any one of the fires, would have involved a recitation of the facts as to the other fires.

3. There was no error in the judge's admission in evidence of unequivocal denials made by the defendant in response to questioning by the police. Past cases reveal two basic reasons why accusatory questions followed by unequivocal denials are to be excluded from evidence. The first reason rests on the hearsay rule. See *Commonwealth* v. *Pleasant,* 366 Mass. 100, 103 (1974); *Commonwealth* v. *Locke,* 335 Mass. 106, 115 (1956); *Commonwealth* v. *Hosey,* 5 Mass. App. Ct. 138, 141 (1977). Accusatory statements and unequivocal denials, when offered as evidence against the defendant for the purposes of proving the Commonwealth's case-in-chief, are simply out-of-court statements offered to prove the truth of the matter asserted.[12] As such, they plainly are hearsay statements which must be excluded. See *Commonwealth* v. *Twombly,* 319 Mass. 464, 465 (1946). See also McCormick, Evidence § 270 at 652 (2d ed. 1972).

---

[12] These statements by their very nature are not "admissions," which are allowable in evidence on the theory that admissions are not hearsay. See *Commonwealth* v. *Trefethen,* 157 Mass. 180, 197 (1892).

The defendant correctly points out in his brief that his unequivocal denials were admitted not for hearsay purposes, but "for the purpose of showing the defendant's state of mind concerning the voluntariness of his confession." The defendant further accurately notes that the judge gave "[c]areful instructions that the statements were admitted to show state of mind only . . . ." Clearly, in these circumstances, the hearsay exclusion does not apply. Cf. *Commonwealth* v. *Sherman,* 234 Mass. 7, 10-11 (1919).

A second subsidiary reason given for the exclusion of accusatory statements followed by unequivocal denials is that the relevance of this type of dialogue may be far outweighed by potential prejudice to the defendant. Cf. *Commonwealth* v. *Pleasant,* 366 Mass. 100, 103 (1974); *Commonwealth* v. *Locke,* 335 Mass. 106, 115 (1956); *Commonwealth* v. *Robinson,* 165 Mass. 426, 428 (1896). Whether such evidence is so prejudicial in nature as to outweigh its probative value and preclude its admission "is a question to be determined by the trial judge in the exercise of his sound discretion." *Commonwealth* v. *D'Agostino,* 344 Mass. 276, 279 (1962).

We find no abuse of discretion here. First, it is difficult in this case to draw any inference of guilt from the police's initial questioning and the defendant's unequivocal denials. Cf. 4 J. Wigmore, Evidence § 1144 (Chadbourn rev. 1972). Second, questions asked the defendant by the police were highly relevant to the issue of voluntariness — to the question whether the defendant was interrogated in circumstances tending to overbear his will. Careful limiting instructions given by the judge were sufficient in this case to clarify the purpose for which the evidence could properly be used.

4. We have reviewed the entire record in light of our duties under G. L. c. 278, § 33E, and we conclude that justice does not require or recommend that we modify the verdict of murder in the second degree, or grant a new trial on that indictment, pursuant to our powers under that statute.

*Judgments affirmed.*