## COMMONWEALTH *vs.* LUIS RIVERA.

Norfolk. February 6, 2004. - March 30, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN & CORDY, JJ.

*Practice, Criminal,* Motion to suppress, Instructions to jury, Voluntariness of statement, Capital case. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Evidence,* Admissions and confessions, Expert opinion. *Mental Impairment. Insanity. Judge. Error, Harmless. Homicide.*

A Superior Court judge properly denied a mentally ill criminal defendant's motion to suppress evidence, where, in the totality of the circumstances, the defendant's waiver of his Miranda rights, given three and one-half hours before he confessed to the crime charged, was valid [364-366], and where the defendant's expert evidence at trial regarding the defendant's inability to retain and integrate facts could not be determinative of the propriety of the motion judge's decision [367] and was too ambivalent in any event to have rendered the verdict unjust [372-373].

No substantial likelihood of a miscarriage of justice was created when the judge at a criminal trial interrupted the testimony of two defense experts on thirty-nine different occasions, where the judge's interjections were appropriate and made in a thoughtful, courteous manner. [367-368]

Reversal of a defendant's conviction of murder in the first degree was not required where the trial judge mentioned in her instructions to the jury that the defendant had not testified, as defense counsel was on notice that the judge would allude to the defendant's not having testified in her instructions and did not request the judge to omit (or later, to strike) such reference. [368-371]

This court declined to expand the traditional, common-law definition of provocation as a mitigating factor reducing murder to manslaughter by relaxing the requirement of an objective stimulus and instead focusing on the defendant's subjective experience, or the events in his mind that provoked the killing. [371-372]

This court declined to read G. L. c. 276, § 33A, the statute providing arrested persons the right to use the telephone, so as to include persons in police custody. [373-375]

INDICTMENT found and returned in the Superior Court Department on September 2, 1998.

A pretrial motion to suppress evidence was heard by *Nonnie S. Burnes,* J., and the case was tried before her.

*Peter M. Onek*, Committee for Public Counsel Services (*Beverly J. Cannone*, Committee for Public Counsel Services, with him) for the defendant.

*Robert C. Cosgrove*, Assistant District Attorney, for the Commonwealth.

COWIN, J. A jury convicted the defendant of murder in the first degree on grounds of deliberate premeditation and extreme atrocity or cruelty. His defense at trial was that he lacked criminal responsibility due to his mental illness at the time of the killing.[1] The defendant appeals, claiming errors in the denial of his motion to suppress[2] and errors at trial. He maintains that his motion to suppress should have been allowed because his mental illness vitiated his waiver of Miranda rights given three and one-half hours before he confessed. The defendant also asserts error based on the judge's allegedly numerous interruptions of the defense experts' testimony; the judge's reference in her instructions to the fact that the defendant had not testified despite defense counsel's request that the matter not be mentioned; and the judge's refusal to instruct on voluntary manslaughter. The defendant also presents the following claims for the first time on appeal, asking that we review them pursuant to our authority under G. L. c. 278, § 33E, to determine whether there has been a substantial likelihood of a miscarriage of justice. He requests that in determining whether his statements to the police should have been admitted at trial we consider the effect on the voluntariness of his waiver of Miranda rights of (a) expert evidence introduced for the first time at trial describing his schizophrenia and its effect on memory, and (b) the impact of the failure of the police to advise him in a timely fashion of his right to make a telephone call as required by G. L. c. 276, § 33A. Finally, the defendant asks that this court exercise its power under G. L. c. 278, § 33E, to reduce the

---

[1]The defendant was also found guilty on three other indictments, which charged him with possession with intent to distribute marijuana, unlawful possession of a firearm, and unlawful possession of ammunition. Those three convictions were placed on file with the defendant's consent and, therefore, are not before this court.

[2]The defendant sought to suppress statements he made to the police, consent forms he signed, and all items seized as a result of the statements and consent forms "and their fruits."

verdict to murder in the second degree or voluntary manslaughter. We reject the defendant's contentions, conclude that there is no basis to exercise our power pursuant to § 33E, and affirm the defendant's conviction.

1. *The judge's findings and rulings regarding the defendant's statements.* We summarize the facts from the judge's careful and comprehensive findings in her memorandum of decision on the defendant's motion to suppress.[3] The victim was stabbed to death behind 1482 Beacon Street in Brookline on July 2, 1998. The police soon focused on Luis Rivera, the defendant. He was a high school graduate, almost twenty-two years old, but did not work or attend school. He was being treated for schizophrenia with Zoloft and Zyprexa, and was on Social Security disability income. On July 3, 1998, at about 9 P.M., Sergeant Gerard R. Mattaliano of the State police and Sergeant Michael McCarthy of the Brookline police department went to the apartment at 1600 Beacon Street where the defendant lived with his parents. They introduced themselves to the defendant and explained that they were investigating the victim's murder. The defendant agreed to speak with them. During the interview the defendant told the police that his memory was "not the greatest" because he was on medication for schizophrenia. His mother confirmed his treatment and that she assured that he took his daily medication. He had been taking the medication in the days just before the murder.

Approximately ten minutes after the interview began, Mattaliano orally advised the defendant of his Miranda rights and handed him a Miranda card that he read on both sides. The defendant indicated that he understood his rights, agreed to continue the interview, and signed the card accordingly. The defendant said that he knew the victim from Brookline High School but that he had not spoken with him for a few months. In response to a question whether he owned a knife, he said that he did and showed it to the police. He told the police that on the night of the murder he was at home, was visited by a friend and the two of them went to Newbury Street. He produced a sales receipt from a Newbury Street music store, indicating

---

[3]The evidence at trial was essentially the same as that at the motion to suppress hearing.

11:57 P.M. on July 2, 1998. In response to questions, the defendant described the clothing he was wearing on the night of the murder and the telephone number of his pager. During the interview, the police noticed cuts on the defendant's body that appeared to be fresh.

The officers told the defendant that he was not under arrest, but asked him to go to the police station for further interviewing. Unbeknownst to the defendant, the officers wanted to talk to him out of the presence of his mother to ask him about possible drug dealing in which they suspected he was involved. At the police station the officers repeated to the defendant that he was not under arrest and obtained his consent to photograph the cuts on his body; take the clothes he had worn the night before; and search his living quarters, property, car, and himself without a warrant. Each of three consent forms was read to him; he then read and signed each. He said that he understood the forms. The officers photographed the cuts and asked the defendant how he got them; he explained their origin.

As the interview continued, the defendant responded to questions about his experience with women, naming particular ones. When the officers asked him about a place called "The Rome," he said that it was an area located behind 1482 Beacon Street and that he had smoked marijuana there in the past. The officers observed that the defendant became nervous when talking about one of his women friends and when discussing "The Rome."

Mattaliano reminded the defendant that this was a serious homicide investigation, that it was extremely important to tell the truth, and that he did not believe the defendant was being truthful. So confronted, the defendant admitted that he had sold marijuana to various people, including the victim. He had sold marijuana to the victim more than twenty times, most recently about two weeks earlier, and considered him a good customer. Mattaliano then told the defendant that two dime bags of marijuana had been found in the victim's pocket and that the police had information that the defendant often sold dime bags of marijuana in "The Rome." Mattaliano asked the defendant if he knew what a hypothetical question was, and, when the defendant responded affirmatively, asked him what he would say if the investigation should reveal his fingerprints on the dime bags found in the victim's pocket. (The police had no such evidence.)

These questions caused the defendant's demeanor to change noticeably. He appeared more concerned, took a deep breath, leaned back in his chair, and admitted to further drug dealing. When asked if he had sold drugs to the victim on the night he was murdered, he told the police that the victim had paged him about 7:30 P.M., left his telephone number (which the defendant recited), and the code for two bags of marijuana. The defendant said that he returned the victim's page at about 8:30 P.M., and arranged to meet him at "The Rome" to make the sale. When Mattaliano asked if he had killed the victim, the defendant became very subdued, covered his face, removed his glasses, stared at the floor, began to cry, and admitted to the killing. (At this point, it was 12:30 A.M., approximately three hours and twenty minutes since the defendant had been given the Miranda warnings at his home.)

The defendant then provided the police a detailed account of how he had approached the victim, how he had held the knife, how many times he had stabbed the victim, and where the wounds were inflicted. He stated that he knew when he left his house that he was going to kill the victim, and that he was very angry with the victim, that the victim was "messing around with his . . . life, with his family's life and with [his friend]." The defendant admitted that he had given the police the wrong knife and clothing and said that he washed and hid the knife he used on the victim and that he had his mother wash the clothing he had worn on the night of the stabbing. The defendant provided additional details about the crime.

Despite repeated questioning on the subject, the defendant provided no reason for the killing, other than his anger at the victim. When Mattaliano suggested that it might be easier for the defendant to write out why he was so angry with the victim, the defendant wrote, "I saw the devil in him. I felt I was doing something right. I saw someone else's face in his."

The interview was conducted in a small office, with the three men seated at a desk. During the interview the defendant was asked twice if he wanted food or a drink. At one point he said that he did and a soda was obtained.

The police did not repeat the Miranda warnings when the defendant arrived at the police station or during the interview.

The defendant never asked to leave, never asked for an attorney, and never said he did not want to talk any further. At no point was he threatened or promised anything. Throughout the interviews, the defendant was calm, respectful, and cooperative. He never appeared confused and answered questions appropriately. He became nervous only when asked about "The Rome" or the murder. He also appeared less open and forthright when discussing a woman he knew and when discussing his drug dealing.

The defendant's booking videotape showed him to be calm, polite, and responsive. The booking officer advised him of his rights to remain silent, to an attorney, and to make a telephone call. At the end of the booking procedure, he did telephone his mother and spoke with her for about twenty minutes. He admitted to her that he had killed the victim and asked questions such as, "Well, what do you want me to do?"

The Commonwealth presented evidence of three prior arrests, two in 1994, and one in 1995, and of a probation violation, and that the defendant had received the Miranda warnings in connection therewith three times.[4]

The defendant's mother testified that he had been diagnosed with mental illness in 1994, for which he had been hospitalized seven times. She stated that her son's medication causes "memory problems" and that he was "easily persuadable." She also testified that she did not hear anyone advise him of his Miranda rights or see him sign anything. She did know that he could leave and that he did not have to speak with the police. She went to the police station sometime after 1 A.M. on July 4 to learn what was happening with her son and was told that the police would send him home or have him call her at the conclusion of the interview and that she should go home. She stated that her son telephoned her at about 4 A.M., and said that he had

---

[4]The judge did not make a finding regarding the defendant's receiving Miranda warnings in connection with his prior arrests, but simply stated that the "Commonwealth also offered evidence" of that information. Because this recitation was in the section of the judge's memorandum and order containing her findings, we imply that she intended to credit this testimony. We take this opportunity to remind trial judges that it is not sufficient simply to repeat the testimony. We cannot ascertain, other than by implication, what evidence a judge finds credible. A judge needs to make specific findings based on the testimony as the judge here did in the earlier part of her findings.

killed the victim and that, "It was me," "I went crazy," and "Mom, that's life."[5]

Based on the above facts and a review of the law, the judge denied the defendant's motion to suppress. She concluded that the defendant received the Miranda warnings, understood them, and made a knowing, voluntary, and intelligent waiver. In particular, she determined that the three hours and twenty minutes that elapsed from the time the warnings were provided did not invalidate the defendant's waiver. She found that, despite his mental illness, he "knowingly and intentionally relinquished" his Miranda rights at 12:30 P.M. when he confessed.

2. *Appellate review.* In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error. The weight and credibility to be given oral testimony is for the judge. See *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), and cases cited. We "independently review[] the correctness of the judge's application of constitutional principles to the facts found." *Commonwealth* v. *Eckert*, 431 Mass. 591, 593 (2000), quoting *Commonwealth* v. *Magee*, 423 Mass. 381, 384 (1996).

A valid Miranda waiver is one that is made knowingly, intelligently, and in all respects, voluntarily. The Commonwealth bears a heavy burden to make this showing. *Miranda* v. *Arizona*, 384 U.S. 436, 475 (1966). *Commonwealth* v. *Murray*, 359 Mass. 541, 546 (1971). "To determine whether to admit a defendant's statements, a court must examine the totality of the circumstances, including the characteristics of the accused and the details of the interrogation." *Commonwealth* v. *Silva*, 388 Mass. 495, 501 (1983), and cases cited. The defendant does not suggest that the police failed to administer accurate and complete Miranda warnings. Nor does he claim that his initial waiver of these rights at his home on Beacon Street was invalid.

Rather, he maintains that the judge erred in two respects. We consider each in turn. First, in regard to the lapse of time between the Miranda warnings and the confession, he claims that the judge erred in relying on cases in which the defendant was not mentally ill. The judge did not err. In finding waiver,

---

[5]See note 4, *supra.*

she appropriately referenced cases in which the court considered the effect of mental illness. She ruled, "A defendant who suffers from a debilitating condition, such as schizophrenia, is capable of making a voluntary statement," and cited *Commonwealth* v. *Crawford*, 429 Mass. 60, 66 (1999); *Commonwealth* v. *Libran*, 405 Mass. 634, 638-639 (1989) (mentally retarded, schizophrenic, manic depressive defendant can make voluntary statement); and *Commonwealth* v. *Allen*, 395 Mass. 448, 456-457 (1985) (judge's finding warranted that statements of defendant recovering from brain surgery were product of rational intellect).

She proceeded to consider the defendant's mental illness and the time lapse in an analysis of the "totality of the circumstances." We have consistently applied a "totality of the circumstances" test for determining whether a waiver is valid. *Commonwealth* v. *Jones*, 439 Mass. 249, 256-257 (2003). The length of time that has passed since the giving of the warnings, and the defendant's mental condition are but two of those factors. See *Commonwealth* v. *Mello*, 420 Mass. 375, 385-386 (1995) (although defendant had "ingested beer and inhaled heroin" on night before his arrest, six hours between Miranda warnings and second confession "in light of all the circumstances" did not require renewed Miranda warnings).

The record supports the judge's conclusion that in the totality of the circumstances here, the defendant's waiver was valid. Although there was evidence at the motion to suppress hearing that the defendant was on medication for schizophrenia and that the medication causes "memory problems," the judge found that the defendant was a graduate of Brookline High School, ran a "successful small-scale" drug business, and controlled his daily schedule. He was calm, coherent, and cooperative at all times during the police questioning. His responses to interrogation were appropriate, thus indicating that he was not confused. She further found that the defendant never exhibited any unusual behavior. He had been arrested three times previously and had received the Miranda warnings at least twice before. His initial statements to the police were attempts to exculpate himself, indicating a sense of self-protection and desire to distance himself from the crime and from culpability. She found it "significant that [the defendant] did not succumb to police pres-

sure and immediately confess . . . upon being accused . . . by the police." As the judge stated, the defendant's "ability to recall a thorough chronology of the events, and a detailed description of the murder and his attempts to cover-up the crime belies a person who was suffering from the effects of . . . schizophrenia, at the time of confession." See *Commonwealth* v. *Vazquez*, 387 Mass. 96, 100 (1982) (schizophrenic's statements to police "chronological," "coherent," "cooperative"; statements voluntarily made). See also *Commonwealth* v. *Ostrander*, *ante* 344, 346 (2004) (in "totality of the circumstances including, in particular," defendant's "very limited intelligence," finding supported that defendant made knowing, voluntary and intelligent waiver of Miranda rights); *Commonwealth* v. *Jackson*, 432 Mass. 82, 87 (2000), citing *Commonwealth* v. *Wallen*, 35 Mass. App. Ct. 915, 917 (1993) (efforts by defendant of low intelligence to exculpate himself support finding of capacity to understand and waive Miranda rights); *Commonwealth* v. *Medeiros*, 395 Mass. 336, 347 (1985) (mentally deficient adult, or adult with "subnormal intelligence," may effectively waive Miranda rights).

The judge specifically considered the defendant's argument that given the length of the interrogation the defendant should have been readvised of the Miranda warnings. She recognized that "Miranda warnings, once given, are not to be accorded unlimited efficacy or perpetuity," *Commonwealth* v. *Cruz*, 373 Mass. 676, 687 (1977), and that even "when there is a significant lapse of time between initial Miranda warnings and inculpatory statements, 'the ultimate question is: Did the defendant, with a full knowledge of his legal rights, knowingly and intentionally relinquish them?" *Id.* She concluded that the time lapse between the initial warnings and waiver at approximately 9:10 P.M. and the confession approximately three hours and twenty minutes later was "not significant and did not negate the validity of the defendant's knowing, voluntary, and intelligent waiver." The judge applied the appropriate law to the facts she found. We decline the defendant's implicit suggestion that a special rule be adopted in the circumstances of a mentally ill defendant. See, e.g., *State* v. *Burge*, 195 Conn. 232, 249 (1985); *State* v. *Monroe*, 142 N.H. 857, 868 (1998), cert. denied, 525 U.S. 1073 (1999), citing *State* v. *Burge, supra.*

The defendant's second claim concerning the motion to suppress is that the judge's waiver findings were contradicted by the defendant's expert evidence at trial regarding his inability to retain and integrate facts. No expert evidence on the defendant's schizophrenia and its effect on memory or mental ability was presented during the motion to suppress hearing. The defendant asks us to consider the *trial* testimony of his experts that a schizophrenic person has difficulty retaining and integrating several different facts at the same time and that, even when the defendant was on medication, his "reality testing [was] still very precarious." The defendant asks us to conclude, based on that trial evidence, that the judge erred in determining that a Miranda warning given over three hours earlier suffices for a person who is a "chronic paranoid schizophrenic." "Evidence adduced at trial but not before the motion judge . . . cannot be determinative of the propriety of the motion judge's decision." *Commonwealth* v. *Ramos*, 402 Mass. 209, 216 (1988). See *Commonwealth* v. *Grandison*, 433 Mass. 135, 137 (2001). This rule is eminently sensible. A contrary rule would deny finality to any decision on a motion to suppress.[6,7] We now proceed to review the claims of error at trial.

3. *Interruption of defense experts.* The defendant next maintains that the judge interrupted the testimony of his two experts on "thirty-nine different occasions," thus straying from her role as impartial arbiter, see *Commonwealth* v. *Sneed*, 376 Mass. 867, 870 (1978), and prejudicing the jury to his detriment. As the defendant concedes, no objection was lodged to these "interruptions," and so we inquire whether there was error, and if so, whether the error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Fitzgerald*, 380 Mass. 840, 849 (1980).

---

[6]The defendant argues that the expert evidence is important relative to the judge's reliance on the fact that the defendant had prior experience in the criminal justice system. In addition to the fact that no expert testimony was presented at the motion hearing, this was but one of many factors supporting the judge's determination that the defendant's waiver was valid.

[7]Nor can we view defense counsel's decision not to present expert testimony at the motion to suppress hearing as anything other than a strategic decision. At the motion to suppress hearing, evidence of the defendant's history of mental illness was introduced by other means, without presenting (and thus exposing) the expert testimony that was the crux of his entire defense at trial.

The defendant argues that the "sheer number" of interruptions must have negatively affected the jury, in particular because the testimony of the primary defense expert, which constituted "the heart of [the defendant's] lack of criminal responsibility" defense, was interrupted thirty times. We have examined the record. The expert in question testified for almost two full days, 395 pages of testimony. The bulk of her primary testimony (well over one hundred pages) was barely subject to interruption by the judge. (The judge interrupted six times in 160 pages of transcript; most of the interruptions occurred after direct examination.) When the judge did intervene, it was appropriate to do so, and the judge's interjections were made in a thoughtful, courteous manner. It is the judge's function to act as the "guiding spirit and controlling mind at a trial." *Commonwealth* v. *Campbell*, 371 Mass. 40, 45 (1976), quoting *Goldman* v. *Ashkins*, 266 Mass. 374, 380 (1929). The judge need not have waited for objections. In addition, the judge instructed the jury that they should not interpret anything she had said as indicative of her view of the case. The judge acted commendably; there was no error.

4. *Instruction on defendant's not testifying.* The defendant maintains that he is entitled to reversal of his conviction because the judge mentioned in her instructions to the jury that the defendant had not testified, after defense counsel explicitly requested that no mention be made of that fact. He contends that reversal is mandated by *Commonwealth* v. *Buiel*, 391 Mass. 744, 746-747 (1984), wherein we stated that it would be reversible error in the future if a judge instructs the jury concerning a defendant's right not to testify when the defendant has requested no such instruction be given.

The judge in this case did not violate the *Buiel* rule. The subject was originally discussed well before the final charge when the judge asked counsel "whether the defendant wants a separate instruction about his not testifying." The judge told counsel that she "ordinarily remind[s] the jurors about the burden of proof, the presumption of innocence, that he's not required to testify." The judge then asked whether the defendant also wanted the "standard [instruction] that . . . highlights it. It says, you may have noticed that the defendant did not testify."

Defense counsel said that she would think about the decision. This exchange put counsel on notice that the judge would mention the defendant's right not to testify in her burden of proof or presumption of innocence instructions and that the judge deemed the instruction about the defendant's not testifying as a wholly separate instruction.

The next trial day, defense counsel submitted to the judge a lengthy proposed instruction on the defendant's right not to testify and the judge agreed to adopt it. Just minutes before final argument, however, counsel notified the judge that she was "withdrawing [her] request [to] charge . . . about the defendant's not testifying, his right not to do so, and that he chose not to." Counsel indicated that the judge should not refer "to it." The judge agreed, but added, "I do put in my standard instructions . . . that the defendant is under no duty to present any evidence; and he sits before you, although charged with a crime, innocent — presumed innocent until proven guilty, and all that kind of stuff. . . . I don't want to mislead you that I'm not going to say anything about that." Counsel replied, "I would prefer that you, of course, talk about the presumption of innocence."

This discussion that occurred just prior to closing argument, together with the judge's original statement should have apprised counsel that the judge alluded to the defendant's not testifying as part of her instruction on presumption of innocence. If counsel did not want the issue mentioned, she did not sufficiently alert the judge. The judge stated in her charge during her instructions on the presumption of innocence that the defendant did not have to present evidence and did not have to testify.[8] After the charge, counsel stated that the judge "actually did draw attention to the defendant not testifying a little bit

---

[8] "The law presumes a defendant to be innocent of a crime, and therefore a defendant, although accused, begins the trial with a clean slate, with no evidence against him or her. And for this reason the presumption of innocence alone is sufficient to acquit a defendant, that is, to find him not guilty, unless you the jury are satisfied beyond a reasonable doubt of the defendant's guilt after a careful and impartial consideration of all of the evidence in the case.

"In a criminal case the burden of proof is on the Commonwealth to prove beyond a reasonable doubt that the defendant is guilty of the charges against him. A verdict of guilty cannot be based upon mere probability, speculation,

more than I thought you would." Defense counsel did not object, although she objected to other portions of the charge. See *Commonwealth* v. *McDuffee*, 379 Mass. 353, 357 (1979) ("It is a fundamental rule of practice that where a party alleges error in a charge he must bring the alleged error to the attention of the judge in specific terms in order to give the judge an opportunity to rectify the error, if any"). The entire sequence indicates that the judge intended to refer to the defendant's not testifying during her presumption of innocence instructions and counsel did not request the judge to omit (or later, to strike) such reference.

Even had the judge's instruction violated the rule in the *Buiel* case, we no longer will apply that rule. As stated in the case itself, the rule is not one of constitutional dimension. It is contrary to our proposition that even "constitutional errors can be harmless beyond a reasonable doubt." *Commonwealth* v. *Owens*, 414 Mass. 595, 603 (1993), citing *Arizona* v. *Fulminante*, 499 U.S. 279, 306 (1991). As we acknowledged in the *Buiel* case, and as apparently still holds true today, see Annot., 18 A.L.R.3d 1335 (1968 & Supp. 2003), "[m]ost courts . . . [view] the giving of such an instruction over objection as not prejudicial error." *Commonwealth* v. *Buiel, supra* at 746 n.2. Our rule is one that has been soundly criticized. See, e.g., *Lakeside* v. *Oregon*, 435 U.S. 333, 341 n.12 (1978), quoting *Becher* v. *United States*, 5 F.2d 45, 49 (2d Cir. 1924) ("It is no doubt better if a defendant requests no charge upon the subject, for the trial judge to say nothing about it; but to say that when [she] does, it is error, carries the doctrine of self-incrimination to an absurdity"). See also the dissent in a case in which Pennsylvania adopted the *Buiel* rule, *Commonwealth* v. *Edwards*, 535 Pa. 575, 581 (1993) (Cappy, J., concurring in part and dissenting in part, with whom Flaherty, J., joined) ("The illogic of this reasoning is simply mindboggling"); Green, The Failure to Testify Instruction, 14 Willamette L.J. 43, 52 (1977) ("If the instruction is given over defendant's objection, a liberal harmless error rule would still seem warranted"). In the *Buiel* case, *supra* at 748, we held that the giving of instructions on

_____

or suspicion. The defendant does not have to present any evidence, and he is not required to offer any evidence in his behalf, *to testify — or to testify himself*" (emphasis added).

the defendant's failure to testify, over the defendant's objection, was "harmless error." See *Commonwealth* v. *Jackson*, 419 Mass. 716, 732 (1995). Finally, we note that in the twenty years since the *Buiel* decision, no Massachusetts appellate case has cited the *Buiel* case to reverse a conviction for an instruction, over objection, to draw no adverse inference from the defendant's failure to testify.[9]

5. *Manslaughter instruction.* The defendant requests that we expand the traditional, common-law definition of provocation as a mitigating factor reducing murder to manslaughter by relaxing the requirement of an objective stimulus. He asks us to permit the primary focus to be on the defendant's subjective experience, the "events" in his mind that provoked the killing. Here, although there was no evidence of a struggle between the victim and the defendant, there was evidence that, to the defendant's psychotic mind, the victim was a demon. Thus, the defendant would have us conclude that because there was no instruction that subjective events could provoke the killing, the judge erred. He claims that the jury should have had the option of a manslaughter verdict.

There was no error. The judge instructed in accord with our law. See *Commonwealth* v. *Diaz*, 431 Mass. 822, 830-831 (2000) (no error in refusing to instruct on manslaughter; despite evidence of defendant's mental impairment, there was no legally adequate provocation). See also *Commonwealth* v. *Costa*, 360 Mass. 177, 184-185 (1971) (no error in refusing to instruct on manslaughter, where there was evidence of defendant's diminished mental capacity not amounting to legal insanity); Model Jury Instructions on Homicide at 12, 21, 27-29 (1999).

We have previously considered and rejected the proposition that a middle ground exists between insanity and criminal responsibility that would not exonerate a defendant but would reduce the degree of the crime from murder to manslaughter, i.e., a defense of "diminished responsibility" or "diminished capacity." See *Commonwealth* v. *Lannon*, 364 Mass. 480, 485 (1974); *Commonwealth* v. *Costa, supra* at 186. We have also

---

[9]We remain of the view that judges should not give the instruction when asked not to do so. We are merely saying that it is not per se reversible error to do so.

rejected the language in the Model Penal Code that the defendant now asks us to adopt. See *Commonwealth* v. *Schnopps*, 390 Mass. 722, 726-727 n.4 (1984). After twenty years, the Legislature, presumed to be aware of our decisions, has not changed the law explicated in the *Schnopps* case.[10] See, e.g., *Commonwealth* v. *Callahan*, 440 Mass. 436, 440-441 (2003).

6. *Review under G. L. c. 278, § 33E.* The defendant asks that pursuant to our responsibility under G. L. c. 278, § 33E, we consider the effect on the voluntariness of his waiver of Miranda rights of two matters that were not presented to the motion judge. The first is his expert testimony at trial explaining his schizophrenic condition and its effect on memory and integration of facts. The second is a claim of delay in informing him of his right to a telephone call under G. L. c. 276, § 33A. Review under G. L. c. 278, § 33E, permits us to "order a new trial" or "direct the entry of a verdict of a lesser degree of guilt" if we are satisfied "that the verdict was against the law or the weight of the evidence . . . or for any other reason that justice may require." See *Commonwealth* v. *Conroy*, 333 Mass. 751, 757 (1956). We must determine, therefore, whether the evidence was unfairly presented to the jury. Clearly, if it were, it contributed significantly to a conviction that otherwise might not have occurred. Cf. *Commonwealth* v. *Cefalo*, 381 Mass. 319, 333 (1980).

a. *Expert testimony.* The defendant requests that we consider the impact on the voluntariness of his Miranda waiver of expert testimony at trial indicating that his ability at 12:30 A.M. to recall the Miranda warnings provided at 9:10 P.M. "may well have been inadequate." He refers specifically to such testimony that the defendant had a memory impairment that affected his ability "to hold several different facts in . . . mind at the same time . . . manipulate them, and produce a response based on

---

[10]The defendant refers to language in *Commonwealth* v. *Boateng*, 438 Mass. 498, 517 (2003), as support for his position. The *Boateng* case concerned the definition of malice for the crime of assault with intent to murder. As the *Boateng* decision recognized, the element of malice for that crime is defined differently from the element of malice for the crime of murder. *Id.* Nothing in *Boateng* overrules *Commonwealth* v. *Schnopps*, 390 Mass. 722, 726-727 n.4 (1984).

integrating [these] facts" and that his "reality testing [was] still very precarious."

The expert evidence does not advance the defendant's argument. The experts testified at trial that the defendant's mental illness caused a *brief* psychotic episode, the stabbing, and that he began to recover from this quite rapidly. One of the defendant's experts conceded that, at the time of the stabbing the defendant was able to "appreciate the wrongfulness of . . . selling drugs and . . . taking the knife with him" but he could not "appreciate the wrongfulness of" killing the victim. This expert also testified that the defendant told her that, at the end of the incident, he "thought [the victim's] life was over"; he feared the police because he "thought [he] did something bad, that [he] stabbed someone"; and he sought to hide incriminating evidence, the knife. The expert agreed that the defendant was trying to "cover it up" when he spoke to the police after he received the Miranda warnings but before he confessed. She also stated that the defendant had "cognitive functioning in many areas." The defendant's other expert testified that the defendant "[was not] always crazy and [evidencing] symptoms." In schizophrenics, "sometimes . . . those rational elements are influential, and sometimes they're not." This expert, who saw the videotape of the booking, acknowledged that the defendant was "quiet . . . cooperative . . . [h]is speech was logical. He gave coherent answers . . . no unusual behavior or unusual verbal responses."[11]

The expert testimony is ambivalent; it does not indicate that the defendant was out of control and suffering from a psychotic episode while he was interrogated by the police, nor does it establish that he was deprived of the ability to make a rational, knowing, and intelligent waiver of his Miranda rights. Considering all the evidence, regardless of when it was introduced, we are not convinced that justice was not done.

b. *Right to a telephone call.* The defendant argues that a

---

[11]The defendant had the opportunity to present this testimony to the motion judge. Indeed, at the motion hearing, he raised the specific issue of his mental ability and its impact on the delay between the warnings and his confession. In addition, his expert witnesses had met with him before the date of the motion hearing.

substantial likelihood of a miscarriage of justice arises from the failure of the police timely to notify him of his right under G. L. c. 276, § 33A, to make a telephone call.[12] Although he agrees that he was informed of this right at booking, he contends that the statute should be interpreted broadly so that it extends not only to those persons under formal arrest, but also to those in custody. See *Commonwealth* v. *Mello*, 420 Mass. 375, 384 n.11 (1995).

General Laws c. 276, § 33A, provides:

> "The police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed forthwith upon his arrival at such station or place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter."

Focusing on the words "in custody" in the first part of the statute (and ignoring the subsequent reference to "arrested person"), the defendant maintains that he was "in custody" as soon as he admitted to drug dealing and should have been advised of his telephone right at that time. He claims that the failure of the police to advise the defendant was intentional, and severely prejudicial because he might have ceased talking to the police had he been permitted a telephone call.

The defendant's argument was rejected by this court only one year ago. In *Commonwealth* v. *Caputo*, 439 Mass. 153, 162 n.11 (2003), in response to the defendant's claim that he was not informed of his right to use a telephone while he was being questioned by the police, we stated that "[t]he police are not required to inform the defendant that he is entitled to a telephone call until the defendant is arrested. . . . The defendant was properly advised that he was entitled to a telephone call when

---

[12]No argument was raised at the motion to suppress hearing regarding the timing of the advice regarding the right to a telephone call; the claim is made for the first time on appeal.

he was booked." See *Commonwealth* v. *Scoggins*, 439 Mass. 571, 578 (2003) ("unfavorable evidence derived from an intentional denial of a suspect's statutory right to a *postarrest* telephone call must be suppressed" [emphasis supplied]); *Commonwealth* v. *Mattos*, 404 Mass. 672, 680 (1989) ("[§] 33A requires that an 'arrested person' be informed of his right to use a telephone"); *Commonwealth* v. *Bouchard*, 347 Mass. 418, 420 (1964) ("The statute . . . is to be construed as requiring that an *arrested person* be informed of his right to use the telephone as soon as reasonably practicable after arrival at the station" [emphasis supplied]).

We decline the defendant's invitation to interpret the statute to require that the right to a telephone call be given to every person who is in custody. The statute was enacted in 1945, and most recently amended in 1963, before the Supreme Court had developed the concept of custodial interrogation and attendant rights in cases such as *Escobedo* v. *Illinois*, 378 U.S. 478, 490-491 (1964), and *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966).[13] In these circumstances, we cannot attribute to the Legislature an intention that the statute was to have the meaning the defendant desires.

Having reviewed the entire transcript pursuant to our obligation under G. L. c. 278, § 33E, we decline the defendant's request that we reduce the verdict to murder in the second degree or voluntary manslaughter.

*Judgment affirmed.*

---

[13]This case does not raise an issue of manipulation of the time of arrest to delay providing the telephone advisement. There was testimony at the motion to suppress hearing that when the police read the defendant his rights at his home, they also advised him that he had the right to make a telephone call. The judge, not having been informed that this was an issue, quite understandably made no finding based on this evidence.