**UNITED STATES of America, Plaintiff,**

**v.**

**Anthony MELNIKAS, Defendant.**

**No. CR–2–96–11.**

United States District Court,
S.D. Ohio,
Eastern Division.

May 24, 1996.

Kevin G. Matthews, Vorys Sater Seymour & Pease, Columbus, OH, James Edgar Phillips, Columbus, OH, for defendant.

J. Michael Marous, United States Attorney's Office, Columbus, OH, for U.S.

### OPINION AND ORDER

DLOTT, District Judge.

The Defendant, Dr. Anthony Melnikas, has been charged with two counts of "Receiving or Possessing Stolen Property," in violation of 18 U.S.C. § 2315, and two counts of "Smuggling" in violation of 18 U.S.C. § 545.[1]

---

1. At the time of the suppression hearing these were the only charges pending against Dr. Melnikas. On May 22, 1996, the Grand Jury returning a superseding indictment charging Dr. Melnikas with an additional count of violating 18 U.S.C. § 2315 and another count of violating 18 U.S.C.

§ 545. The two new charges relate to a fourteenth century folio, page number 235, missing from the Archivo Y Biblioteca Capitulures, Catedral De Toledo, Toledo, Spain. This opinion does not address the new charges.

On April 16, 1996, Dr. Melnikas moved to suppress statements he provided to agents of the United States Custom Service on May 19, 1995 (doc. # 42). The Court conducted an evidentiary hearing on Defendant's motion on May 1, 1996. At that time defense counsel asked for a ruling from the Court—in advance of Defendant's testimony—regarding the proper scope of cross-examination under Federal Rule of Evidence 104(d). Based on the Court's ruling, Dr. Melnikas decided not to take the stand.

On May 2, 1996, the Court informed the parties that its previous ruling regarding 104(d) was overbroad. The Court provided the parties with an opportunity to reargue the issue and issued a revised ruling on May 13, 1996. In light of the Court's amended ruling, the Defendant elected to reopen the hearing and testify. On May 16, 1996, the Court heard testimony from Dr. Melnikas and Assistant United States Attorney Michael Marous regarding the events of May 19, 1995. Based on all the testimony—as well as the submissions of the parties—this Court has uncovered the following facts relevant to the disposition of Dr. Melnikas's motion.

## I. FACTUAL BACKGROUND

Somewhere between 5:30 and 6:00 p.m. on the evening of May 19, 1995, United States Customs Agents Mark L. Beauchamp and Joseph P. Modie arrived at the home of Dr. Anthony Melnikas. Agent Beauchamp had in his possession a warrant—obtained earlier in the day—to search Dr. Melnikas' home in connection with an investigation of missing folio pages from a fourteenth century Vatican manuscript. The agents were greeted at the door by Mrs. Melnikas and, upon identifying themselves and displaying their credentials, were invited to enter. Dr. Melnikas joined his wife and the agents shortly thereafter and the parties moved from the entryway into the living room, where they were seated. Neither then, nor at any time during the evening, did the agents display any weapons, handcuffs, nor make any effort to arrest Dr. Melnikas or execute the search warrant.

The agents proceeded to interview Dr. Melnikas—initially in the presence of Mrs. Melnikas—regarding the missing Vatican folios. Approximately 10–15 minutes into the conversation Mrs. Melnikas left the room at the direction of her husband. She was not seen again by Agent Beauchamp or Modie, although Mrs. Melnikas testified that she later surreptitiously overheard a portion of her husband's conversation with the agents.[2]

Agent Beauchamp initiated the interview by producing a three-by-five inch color transparency of a picture representing one of the missing Vatican folio pages. He proceeded to question Dr. Melnikas regarding the folio depicted in the transparency as well as the other missing folio pages. It is undisputed that at no time during this initial conversation did Agent Beauchamp or Modie raise the issue of the Vatican, the restoration of the folio pages, or any possible criminal action.[3]

**Mr. Marous:** Now, in that half hour, there was no discussion of the Vatican, right?
**Dr. Melnikas:** No.
**Mr. Marous:** There was no discussion of restoration?
**Dr. Melnikas:** No, not at all.
**Mr. Marous:** Of this particular page?
**Dr. Melnikas:** You mean compensation for restoration.
**Mr. Marous:** Or even compensation for restoration?
**Dr. Melnikas:** No.
**Mr. Marous:** There was no discussion of a criminal charge against you, was there?
**Dr. Melnikas:** No.
Suppression Hearing Transcript, May 16, 1996, (hereinafter "Tr. # 2"), at 219.

---

2. Mrs. Melnikas spent most of the evening either in the kitchen or upstairs, out of range of the discussion taking place between her husband and the customs agents. After retiring upstairs, however, Mrs. Melnikas decided to sneak behind the stairwell and eavesdrop on her husband's conversation. Suppression Hearing Transcript, May 1, 1996, (hereinafter "Tr."), at 145–46. Crouched behind the stairwell for approximately five to seven minutes, Mrs. Melnikas heard only one thing; the voice of the "younger" agent telling her husband, "You better cooperate. You don't want [sic] your neighbors to see you be taken to the car away. You wouldn't have to face the grand jury. The only thing would be you would have to pay for the restoration of the manuscripts." (Tr. 147, 163, 164).

3. At the suppression hearing, Dr. Melnikas testified to the following:

Agent Beauchamp first raised the issue of the Vatican approximately one hour after arriving at the Melnikas' home. Soon thereafter, Agent Modie instructed Dr. Melnikas on the "two avenues" available under the criminal justice system: facing a grand jury, an indictment and possible arrest, or pursuing an information and a plea. (Tr. 27, 98, 99). Agent Beauchamp testified he informed Dr. Melnikas he would not be arrested that evening, although he did describe to Dr. Melnikas the circumstances surrounding an arrest.[4] At no time during this discussion were promises or assurances made to Dr. Melnikas. In fact, the agents specifically told Dr. Melnikas that the only person with authority to make decisions regarding his case was the Assistant United States Attorney, Michael Marous. (Tr. 28, 29, 75, 76, 100).

Dr. Melnikas then indicated he wished to speak with Mr. Marous. Agent Beauchamp proceeded to the next room to phone Mr. Marous, leaving Dr. Melnikas alone with Agent Modie. The ensuing conversation between Dr. Melnikas and Agent Modie took place in the living room, outside the hearing of Agent Beauchamp, and lasted no more than three to four minutes. (Tr. # 2, 201, 202, 231). Substantively, however, the parties presented sharply conflicting versions of what transpired.

According to Agent Modie, Dr. Melnikas repeatedly asked him what would be the best way to resolve the situation. (Tr. 102). His only response was to advise Dr. Melnikas to direct his questions to the Assistant United States Attorney. (Tr. 102, 103). Agent Modie testified that he did not make any representations or statements to Dr. Melnikas regarding criminal charges or restoration to the Vatican. (Tr. 102)

Dr. Melnikas' account of this conversation differs substantially. He testified that during this time alone Agent Modie,

[W]as quite specific by repeating constantly that I have to cooperate, and if I will cooperate, I will not be seem by my neighbors in [a] very embarrassing situation as agents would be taking me into their car. From that point, he moved to another topic, indicating again the necessity for cooperation, which would lead me to avoid facing of the grand jury. And as I recall, the last part of the conversation was that, if I cooperate, the only financial or only penalty I may have is the financial compensation for the restoration of the Vatican manuscript.

(Tr. # 2, 202).

What is not in dispute, however, is that Dr. Melnikas spoke with Mr. Marous by telephone immediately following this exchange with Agent Modie. On cross-examination Dr. Melnikas conceded that at no point during this conversation did Mr. Marous make any promises, threats or even mention the restoration of the Vatican folios. (Tr. # 2, 237).[5] In fact, Mr. Marous testified—and his notes corroborate—that he specifically informed Dr. Melnikas a decision had not yet been made regarding how to proceed in his case. (Tr. # 2, 256, Exhibit "J") Mr. Marous advised Dr. Melnikas of the possibility of criminal charges, and that he had a right to have an attorney represent him in this matter. Dr. Melnikas persisted in his willingness to cooperate, and the two made plans to meet the following Monday.

Following the conversation with Mr. Marous, Dr. Melnikas signed a Miranda waiver and provided Agents Beauchamp and Modie with a three sentence statement.[6] Dr. Melni-

---

4. On direct examination Agent Beauchamp testified:

> **Mr. Marous:** Was there a conversation about the consequences of what an arrest would mean? Was there a statement made about what an arrest would entail?
>
> **Agent Beauchamp:** I believe an arrest was described to him, yes, you know, that, if an arrest warrant were issued, that could mean somebody coming out to a person's house and physically arresting that person, handcuffing them, if necessary, obviously putting them in a car to transport them elsewhere.

Tr. 35, 36.

5. Mr. Marous's notes indicate that restoration was discussed and that he informed Dr. Melnikas any such decision would have to include Father Boyle. (Tr. Exhibit "J"). According to Dr. Melnikas, however, "[Mr. Marous] did not mention Father Boyle's name nor restoration during that conversation on the phone." (Tr. # 2, 237).

6. The substance of the statement, dated May 19, 1995, at approximately 8:15 p.m., reads: "As far as I can remember, during one of my visits to the

kas read the statement of rights and waiver before signing it.[7] Just before signing the waiver, Mr. Marous informed him of his right to an attorney. According to Dr. Melnikas, there was no discussion of arrest or the grand jury, or any promises made to him in between his signing the waiver and commencing to write his statement. (Tr. #2 242, 243).

Dr. Melnikas paused after writing the first sentence of his statement and read it aloud to the agents. Agent Beauchamp reacted by shaking his head and indicating he was not satisfied. According to Dr. Melnikas, at this point Agent Modie reiterated the need for cooperation and "briefly referred to the previous statements, what I would face if I would not cooperate." (Tr. #2, 209). It is undisputed that at this juncture there was no specific mention of arrest, jail, promises or avoiding the grand jury. Rather, according to Dr. Melnikas, Agent Modie referenced the "theme of cooperation" which he understood to mean three scenarios: the threat of arrest, or avoiding the grand jury and receiving only a penalty of restoration to the Vatican. (Tr. #2, 245–252). Regarding the substance of the second sentence, Dr. Melnikas testified that Agent Modie, "reiterated that the reflection of full cooperation would be if I would indicate that I cut these leaves, which I right away indicated I did not cut them,, but he continued to refer to the conversation we had when Mr. Marous was on the phone." (Tr. #2, 251).

Agents Beauchamp and Modie provided a very different account of these events. First, according to the testimony of both agents, it was Agent Beauchamp and not Agent Modie who addressed the sufficiency of Dr. Melnikas' first sentence after it was written. (Tr. 38, 77, 78) Agent Beauchamp stated that:

I read the statement, and I explained to him that I was not going to tell him what to write in his statement. However, that if he wished to make a statement and show cooperation and truthfulness, that I suggest he show complete cooperation and truthfulness. I indicated to him that this portion that he had written certainly looked to me like that was not complete cooperation and truthfulness, that he was still hedging.

(Tr. 38). To illustrate his point, Agent Beauchamp gestured to folio page 114, lying on the coffee table, and indicated that it appeared the page had been cut out. At that time Dr. Melnikas proceeded to write the second and third sentences. Agent Modie swore Dr. Melnikas to the statement, he signed it, and the agents departed.

## II. DISCUSSION

Defendant bases his motion to suppress on essentially two alternative grounds: 1) his statements and Miranda waiver were involuntarily made and therefore must be excluded and rendered invalid; 2) the agents were required, under *Miranda v. Arizona*, to issue warnings upon entering his home and thus any statements made prior to giving the warnings must be suppressed. The Court will examine each of these arguments in turn.

### A. Voluntariness of Defendant's Statements

Voluntariness is the touchstone for determining the admissibility of a confession under our Constitution and criminal jurisprudence. *See e.g., Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936); *Culombe v. Connecticut*, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). There is, however, no talismanic definition of voluntariness. *Schneckloth v. Bustamonte*, 412 U.S. 218, 224, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973) (quoting *Culombe*, 367 U.S. at 604–605, 81 S.Ct. at 1880 ("The notion of 'voluntariness' is itself an amphibian.")). It is the Court's responsibility to preliminarily decide—based on an intensive review of the facts of each case—whether a confession or incriminating statement was voluntarily

---

Vatican Library I found these three (3) leafs of manuscripts loose and they ended up in my possession with the other papers—research notes. But, now that I see edges being with signs of being cut-out[.] It could be that I have done it." (Tr. Exhibit "C").

7. There is no question that Dr. Melnikas understands and is proficient in the English language. He has taught college courses in the United States for more than forty years. (Tr. 238).

made. 18 U.S.C. § 3501; *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (allowing a jury to determine the voluntariness of a defendant's statements violates defendant's rights under the Fifth and Fourteenth Amendment). The government has the burden of proving by a preponderance of the evidence that the statement was in fact voluntary. *Lego v. Twomey*, 404 U.S. 477, 488–89, 92 S.Ct. 619, 626–27, 30 L.Ed.2d 618 (1972).

■ In *McCall v. Dutton*, 863 F.2d 454 (6th Cir.1988), *cert. denied*, 490 U.S. 1020, 109 S.Ct. 1744, 104 L.Ed.2d 181 (1989), the Sixth Circuit set forth a three-part test for determining the voluntariness of a confession:

> Threshold to the determination that a confession was "involuntary" for due process purposes is the requirement that the police "extorted [the confession] from the accused by means of coercive activity." Once it is established that the police activity was objectively coercive, it is necessary to examine [the defendant's] subjective state of mind to determine whether the "coercion" in question was sufficient to overbear the will of the accused. Finally, [the defendant] must prove that his will was overborne because of the coercive police activity in question.

*Dutton*, 863 F.2d at 459. A court must examine these factors in light of the "totality of the circumstances surrounding the confession," including "both the characteristics of the accused and the details of the interrogation, and determine[ ] their psychological impact on an accused's ability to resist pressures to confess." *United States v. Rigsby*, 943 F.2d 631, 635 (6th Cir.1991), *cert. denied*, 503 U.S. 908, 112 S.Ct. 1269, 117 L.Ed.2d 496 (1992) (quoting *United States v. Brown*, 557 F.2d 541, 546 (6th Cir.1977)).

■ It is clearly established that an involuntary confession may result from psycholog-

ical, as well as physical coercion. *Arizona v. Fulminante*, 499 U.S. 279, 285–89, 111 S.Ct. 1246, 1251–54, 113 L.Ed.2d 302 (1991); *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995). At issue in this case is whether customs agents psychologically coerced Dr. Melnikas into confessing by employing what amounted to a "carrot-and-stick" approach during interrogation. According to Dr. Melnikas, there were two carrots and one stick: he would not have to face the grand jury and the only penalty would be restoration to the Vatican, or he would be arrested and embarrassed before his neighbors.

As a factual matter, the record reveals that at least once during the evening of May 19, 1995, an arrest scenario was described to Dr. Melnikas. (Tr. 35, 36).[8] The question is whether, under these circumstances, an implication by law enforcement officials that a defendant may be arrested is objectively coercive under the test of *McCall*.[9] The Court finds that it is not.

■ The Fifth Amendment guarantees the right of a person to remain silent and to suffer no penalty for the exercise of this right. *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964). Threatening to inform the court or a prosecutor of a suspect's refusal to cooperate in order to elicit such cooperation violates an individual's Fifth Amendment right to remain silent and is clearly coercive. *United States v. Harrison*, 34 F.3d 886, 891 (9th Cir.1991). Similarly, direct threats of immediate imprisonment may, under certain circumstances, prove coercive. *See Williams v. Withrow*, 944 F.2d 284 (6th Cir.1991) rev'd on other grounds, *Withrow v. Williams*, 507 U.S. 680, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993). Dr. Melnikas does not allege that the

---

8. The parties dispute whether Dr. Melnikas was also specifically told that he would not be arrested that evening. The Court's recognition that an arrest scenario was at some point described to Dr. Melnikas is in no way intended to discredit the testimony of Agent Beauchamp, that Dr. Melnikas was also advised such circumstances would not occur that evening. (Tr. 34).

9. Dr. Melnikas testified that the term "arrest" was never in fact used, but that he understood the agent's description to refer to an arrest. (Tr. # 2, 226).

agents threatened him in any such manner.[10] The agents simply explained—indirectly— the possible consequences of Dr. Melnikas's decision. Describing a hypothetical arrest scenario and alluding to it as a possibility in the context of a two and a half hour interrogation at a suspect's home is not impermissibly coercive. *See United States v. Little,* 12 F.3d 215, 1993 WL 501570 (6th Cir.1993) (unpublished).

Dr. Melnikas alleges that this arrest scenario was coupled with assurances that if he cooperated, he would not have to face the grand jury and would only be required to restore the folios to the Vatican. The record supports the notion that Dr. Melnikas was informed of the possibility of avoiding the grand jury by cooperating. The record does not support, however, Dr. Melnikas' claim that he was told the **only** penalty would be restoration to the folios. The Court finds the testimony and notes of Assistant United States Attorney Mike Marous credible. His notes indicate that Dr. Melnikas was specifically told no decision had yet been made regarding how his case would proceed. (Tr. # 2, 256, Exhibit "J").

■ Moreover, the Court finds that as a matter of law the customs agents did nothing improper by suggesting that Dr. Melnikas could help himself by cooperating. A confession is not deemed involuntary merely because a suspect is promised leniency for cooperating with law enforcement officials. *See, e.g., United States v. Bye,* 919 F.2d 6, 9– 10 (2d Cir.1990) ("[W]e are unconvinced that the mere mention of the possible sentence facing a defendant and the benefits to be

derived from cooperation converts an otherwise proper encounter between the police and the accused into a coercive and overbearing experience."); *United States v. Guerrero,* 847 F.2d 1363, 1366 (9th Cir.1988). While promises of leniency that amount to a grant of immunity may render a confession invalid, *see United States v. Parker,* 997 F.2d 219, 222 (6th Cir.1993), the Court finds that such circumstances are not present in this case.

The totality of the facts surrounding Dr. Melnikas's encounter with Agents Beauchamp and Modie demonstrate that he was fully advised of his rights and that he voluntarily agreed to give a statement and speak to law enforcement officers without an attorney being present. An Assistant United States Attorney specifically told Dr. Melnikas that no decision had been made on how his case would proceed, and he was advised that this was a criminal matter and that he had a right to have an attorney represent him. Dr. Melnikas possesses a doctorate degree and has been a college professor for more than forty years. He was alert, able to understand and communicate with the agents, and was not suffering from any apparent physical or mental condition that might render his confession other than voluntary and intelligent. The entire two and a half hour interview was devoid of any sign of force or physical threat.

■ In sum, Dr. Melnikas voluntarily provided law enforcement agents with a statement on May 19, 1995. Similarly, Dr. Melnikas's waiver of his rights was the product of a free and voluntary choice and is therefore valid.[11] The testimony sufficiently demon-

---

10. Dr. Melnikas's claims stem entirely from a three minute conversation alone with Agent Modie and subsequent indirect references thereto. This conversation took place before he spoke with the Assistant United States Attorney and approximately one-half hour before he signed the Miranda waiver and gave a statement. As to the substance of his allegations, Dr. Melnikas readily admitted that Agent Modie's statements were not a threat:

> **Mr. Marous:** Okay. Now, going back to the waiver form, it says on there, "I waiver freely and voluntarily without threat or intimidation." Okay. Now, you signed this statement saying that no threat had been made to you, and your testimony is that a direct threat had been made to you?

> **Dr. Melnikas:** Well, it was not that in dramatic sense that threat was made. Promises were made.
> Tr. # 2, 242.

11. The Court's conclusion that Dr. Melnikas's confession was voluntary is tantamount to a determination that his Miranda waiver was also voluntary. *See Colorado v. Connelly,* 479 U.S. 157, 169–70, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986) ("There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the Miranda waiver context than in the Fourteenth Amendment confession context.") In addition to voluntariness, however, a Court must determine that a suspect knowingly and intelligently waived his rights under Miranda. *See*

strates that any representations made to Dr. Melnikas that evening did not rise to the level of express and unambiguous promises of leniency or threats discussed in the case law and forbidden under the Constitution. ·The evidence also demonstrates that even if the statement of Agent Modie could be construed to constitute a promise of leniency and or some type of threat, this statement, by itself, was not sufficient to overbear Dr. Melnikas' will.

## B. Admissibility of Statements Preceding Miranda Warnings

■ Alternatively, Defendant argues that the custom agents were required under *Miranda v. Arizona* to give warnings at the outset of their questioning, and thus, any statement made by Dr. Melnikas prior to the issuance of these warnings must be suppressed.

■ Law enforcement officers must give Miranda warnings only to those suspects who are in custody. *United States v. Peete*, 919 F.2d 1168, 1177 (6th Cir.1990). As the Supreme Court has explained:

> Although the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest."

*California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714)). Whether a person is in custody depends upon how a reasonable person in the suspect's position would have understood his or her situation. *United States v. Macklin*, 900 F.2d 948, 951 (6th Cir.), *cert. denied*, 498 U.S. 840, 111 S.Ct. 116, 112 L.Ed.2d 86 (1990) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984)).

Dr. Melnikas was questioned in his home, for approximately two and a half hours. He testified that at no point while reading the statement of rights or signing the waiver form did he ask the agents to leave. (Tr. #2, 242). He was told by the Assistant United States Attorney that this was a criminal matter and that he had a right to an attorney. He was told that he would not be arrested that evening. Knowing all this, he never told the agents he did not wish to speak with them anymore (Tr. #2, 242).

The Supreme Court addressed facts similar to the facts of this case in *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). Agents in *Beckwith* interviewed the defendant in his home and informed the defendant that they were investigating the possibility of criminal violations. *Id.* at 343, 96 S.Ct. at 1614. Defendant Beckwith was the focus of the investigation at the time of the interview. *Id.* at 345, 96 S.Ct. at 1615. Although the Supreme Court recognized that some non-custodial interrogations might possibility require Miranda warnings, the Court concluded that, "An interview with Government agents in a situation such as the one shown by this record simply does not present the elements which the *Miranda* Court found so inherently coercive as to require its holding." *Id.* at 347, 96 S.Ct. at 1616.

Because a reasonable person in Dr. Melnikas's position would not have thought that he was in custody, the Court finds that the customs agents were not required to advise Dr. Melnikas of his Miranda rights before initiating questioning. Accordingly, Defendant's motion must be denied.

## III. CONCLUSION

Based upon a full review of the record, including the submissions of the parties and the testimony and other evidence presented at the two-day evidentiary hearing, and for the reasons stated above, Defendant's Motion

---

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986). Aside from the allegations of coercion—already addressed by the Court—Defendant presented no evidence to suggest that his waiver was not voluntary and intelligent. *Cf. United States v. Bautista–Avila*, 6

F.3d 1360, 1365–66 (9th Cir.1993) (rejecting Defendant's claim that his alienage (Mexican) and mentality (sixth grade education) prevented him from making a knowing and intelligent waiver of his Miranda rights).

to Suppress Statements (doc. # 42) is hereby **DENIED.**

**IT IS SO ORDERED.**