UNITED STATES of America

v.

Michael JACQUES.

No. 09–cr–30001–MAP.

United States District Court,
D. Massachusetts.

May 9, 2011.

Erin Aslan, United States Department of Justice, Washington, D.C., Nicole Lee Ndumele, Kevin O'Regan, Paul H. Smyth, United States Attorney's Office, Springfield, MA, for Plaintiff.

Lori H. Levinson, Barrington, MA, for Defendant.

*MEMORANDUM REGARDING DE-FENDANT'S MOTION TO SUP-PRESS AND MOTION FOR RE-CONSIDERATION (Dkt. Nos. 129 & 237)*

PONSOR, District Judge.

## I. *INTRODUCTION*

On January 27, 2009, Defendant was charged with deliberately setting fire to the Macedonia Church of God in Christ in Springfield, Massachusetts. The second superseding indictment offered counts for conspiracy against civil rights in violation of 18 U.S.C. § 241; damage or destruction to religious real property in violation of 18 U.S.C. § 247(c); and use of fire to commit a felony in violation of 18 U.S.C. § 844(h)(1). On April 14, 2011, following a jury trial, Defendant was found guilty on all three charges.

Prior to trial, Defendant moved to suppress certain inculpatory statements he made during a lengthy interview with law enforcement officers.[1] (Dkt. No. 129.) At the conclusion of an evidentiary hearing, the court ruled orally that motion was denied. This memorandum will set forth the reasons for the court's ruling both on Defendant's motion to suppress (Dkt. No. 129) and on his motion for reconsideration (Dkt. No. 237).

## II. *FACTUAL BACKGROUND*

### A. *The Fire.*

In early 2008, congregants of the Macedonia Church of God in Christ ("the Church"), a predominantly African–American church, began construction of a new building at 215 Tinkham Road in Springfield, Massachusetts. By November, the Church was seventy-five percent complete. In the early morning hours of November 5, 2008, shortly after it became clear that Barack Obama would be the next President of the United States, neighbors observed the Church engulfed in flames.

### B. *The Investigation.*

The National Response Team for the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") conducted a preliminary investigation into the cause of the fire and quickly concluded that the fire was

---

1. Although the government challenges the notion that Defendant was under arrest, the court disagrees for reasons that follow.

deliberately set and that gasoline had been used to ignite the building. A joint task force including ATF, the Federal Bureau of Investigation ("FBI"), the Springfield Police Department, and Massachusetts State Police ("MSP") was created to investigate the incident. The task force soon focused its investigation on Benjamin Haskell and Defendant Michael Jacques, after a civilian witness told investigators that they had boasted of their involvement in the church arson to him.

Shortly after receiving this information, law enforcement officials arranged to have the civilian witness introduce State Trooper Henot Rivera, working undercover, to Haskell. Trooper Rivera made three controlled purchases of narcotics from Haskell, one of which turned out to be a sham bag of heroin. Trooper Rivera, working under the name "Jose," then told Haskell that he could compensate for the botched drug deal by burning down a house in Springfield and an abandoned property in Holyoke, Massachusetts, as part of a fictional insurance scam "Jose" was purportedly arranging.

On January 14, 2009, while driving to the location of the concocted Holyoke arson to survey the area, "Jose" encouraged Haskell to describe his credentials as a competent arsonist. In a gesture of reassurance, Haskell confided to the trooper, in a recorded conversation, that he and Defendant Jacques had committed the church arson. The joint task force then intervened and transported Haskell to a police interview room, where, under questioning (and confronted with his recorded boasts to Trooper Rivera), he eventually confessed to committing the church arson with the help of Defendant and two other individuals. Haskell thereupon agreed to cooperate with law enforcement in the continued investigation of the church fire, and particularly of Defendant Michael Jacques and a third defendant Thomas Gleason.

## C. *Defendant's Confession.*

The following day, on the evening of January 15, the task force coordinated a meeting between Haskell, Defendant, and Trooper Rivera, who remained undercover as Jose, in which Defendant made incriminating statements concerning his own involvement in the church arson. These admissions were made by Defendant both while he was with Haskell and Trooper Rivera and, more importantly, while he was alone in the undercover vehicle with Haskell during a brief period when Trooper Rivera had left, ostensibly to purchase cigarettes. Following the same protocol used with Haskell, law enforcement transported Defendant Jacques, once he had made the admissions on tape, to an interview room for questioning.

Defendant's questioning commenced at approximately 7:20 p.m., when he was informed of his *Miranda* rights and waived them. It was apparent from the videotape of the interview itself, and from Defendant's testimony at the suppression hearing, that he had a clear understanding of his *Miranda* rights and waived them knowingly, intelligently, and voluntarily.

State Trooper Michael Mazza and FBI Special Agent Ian Smythe thereafter conducted the interrogation, which was videotaped in its entirety and which lasted approximately six hours and thirty minutes. For much of the interrogation, Defendant denied his involvement in the fire, claiming that his incriminating statements to the undercover trooper were merely an attempt to make himself "look bigger." (Gov't Ex. 11, Interrogation Tr. 35.)

When approximately six hours had elapsed, at 1:17 a.m., Trooper Mazza handed Defendant a waiver of his right to prompt presentment and read the document aloud to him. Defendant then signed the waiver. Roughly thirty minutes later, at 1:45 a.m., Defendant admitted his in-

volvement in the church arson. He was arraigned later that morning.

### III. DISCUSSION

Defendant moved to suppress his confession on the following grounds: (1) he did not waive his *Miranda* rights knowingly, intelligently, and voluntarily because he was suffering from drug intoxication and/or withdrawal; (2) coercive police conduct forced him to confess, specifically the intensity of the interrogation and implied threats of increased punishment if he refused to cooperate; and (3) he did not waive his right to a prompt arraignment knowingly, intelligently, and voluntarily because he was suffering from drug withdrawal. For the reasons stated below, the court finds these arguments unpersuasive.

### A. *Miranda Waiver.*

Defendant signed a waiver of his *Miranda* rights immediately upon entering the Massachusetts State Police barracks at 7:20 p.m. on January 15, 2009. Defendant concedes that he signed a written waiver of his *Miranda* rights, but argues that he did so while under the influence of Percocet, which, by his own admission, he had been abusing for almost four years.

#### 1. *Custodial Interrogation.*

Prior to custodial interrogation, police must advise arrestees of their rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It is clear, despite the government's arguments to the contrary, that Defendant was in custody from the time he exited Trooper Rivera's undercover vehicle. Surveillance footage indicates that this occurred at 7:16 p.m., at which time officers surrounded the vehicle and Defendant was escorted into the police station. The government emphasizes that the officers did not draw their guns, did not handcuff Defendant, and did not inform him that he was under arrest. Nonetheless, Defendant testified at the suppression hearing that he did not believe that he was free to leave, (Dkt. No. 224, Tr. 2/3/11, 12–14), and this court finds the testimony credible and the belief reasonable under the circumstances.

#### 2. *Waiver.*

A defendant may waive the rights conveyed in the *Miranda* warnings "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. Signing a written waiver form is strong, though not conclusive, proof of the validity of that waiver. *See North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver."). A *Miranda* waiver is done voluntarily if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). The waiver is done knowingly and intelligently if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Courts look to the totality of the circumstances, including the details of the interrogation and the characteristics of the accused, to determine if a *Miranda* waiver is the result of "an uncoerced choice" and of "the requisite level of comprehension." *Id.*

Although Defendant testified that he was "still feeling the effects" of Percocet at the time he signed the *Miranda* waiver and began answering questions, (Dkt. No. 224, Tr. 2/3/11, 11), he also testified that his alleged drug use did not inhibit his ability to understand the investigators' questions during the interroga-

tion, (*Id.* at 15.) At no time did he indicate to the investigators that he was under the influence of narcotics or act in a manner consistent with narcotics use. On the videotaped interrogation, which includes the time during and subsequent to the signing of the waiver, Defendant shows no visible or audible signs of impairment whatsoever. His demeanor and mannerisms appear perfectly normal, and his answers are both cogent and responsive.

In addition, Defendant testified that he had been arrested and read his *Miranda* rights several times in the past. (*Id.* at 52–55.) He testified that, on January 15, despite his alleged narcotic use, he understood each of the rights he was forfeiting when he signed the *Miranda* waiver. (*Id.* at 12, 52–55.) Accordingly, based on the totality of the circumstances, this court finds that Defendant's waiver of his *Miranda* rights was the product of an uncoerced choice and was made with the requisite level of comprehension.

## B. *Voluntariness of Confession.*

■ To be admissible, a confession must not only be obtained within the dictates of *Miranda,* but it must also be provided voluntarily. *Dickerson v. United States,* 530 U.S. 428, 432–33, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). The touchstone of voluntariness is whether coercive police activity overbore the will of the defendant such that the "statement was not [a] free and voluntary act . . . ." *Procunier v. Atchley,* 400 U.S. 446, 453, 91 S.Ct. 485, 27 L.Ed.2d 524 (1971). That question must be resolved "in light of the totality of the circumstances." *Id.* A "defendant's mental state by itself and apart from its relation to official coercion never disposes of the inquiry into constitutional voluntariness." *United States v. Palmer,* 203 F.3d 55, 61–62 (1st Cir.2000). Thus, "[e]ven if [the defendant] was in a weakened condition because of his withdrawal symptoms,

it does not necessarily follow that his post-arrest statements were involuntary." *Id.*

Here, Defendant has not established either that he was in a weakened condition as a result of withdrawal or that police coercion precipitated his confession. Thus, his post-arrest statements were voluntary.

### 1. *Defendant's Condition.*

In his affirmation, Defendant stated that, as the interrogation went on, he was "beginning to feel the effects of withdrawal from Percocet" and "by the time I admitted participating in burning the church, I would have said anything the officers wanted me to say to end the questioning." (Dkt. No. 131, Jacques Aff. ¶¶ 13–14.) At the suppression hearing, he testified that he "felt bad" and that he "had a horrible need for more [Percocet]." He further elaborated, "I started to feel a little sick. My nose was running. I was cold. . . ." (Dkt. No. 224, Tr. 2/3/11, 16.)

■ In response, the government called as witnesses Trooper Rivera, Trooper Mazza, Trooper David Percy, Trooper Joseph Gura, MSP Captain Peter Higgins, Agent Smythe, FBI Special Agent Mark Karengekis, Deputy U.S. Marshal David Milne, Springfield Police Department Sergeant Roy Carter, and Hampden County House of Correction Nurse Meredith Passa. Each of these witnesses interacted with Defendant at some point between his car ride with Trooper Rivera on January 14 and the time at which he was processed at the Hampden County House of Correction on January 16, 2009. Each witness testified that he or she observed no signs of physical or mental distress consistent with drug withdrawal at any time during this period.

In particular, Nurse Passa testified that when she met with Defendant as part of the intake process on January 16, Defendant told her that he had been taking

Percocet daily for four years, prompting her to check specifically for signs of drug withdrawal. Yet, Nurse Passa did not observe any such symptoms:

> I took in[to] consideration his blood pressure but he wasn't the picture of opiate withdrawal. He didn't have any gastrointestinal symptoms. He didn't have the shakes. He didn't have any other symptoms, the goose bumps. He was sitting still. He wasn't anxious.
>
> . . . .
>
> [H]e wasn't showing any symptoms. He didn't look sick. All the arrows pointed to he was not detoxing.

(Dkt. No. 204, Tr. 10/6/10, 91–93.)

The videotaped interrogation only reinforces Nurse Passa's conclusions. As at the outset of the interrogation when he signed the *Miranda* waiver, Defendant remained cogent and responsive throughout the questioning, up to and including his confession. Defendant's answers were grammatical, pertinent, articulate, and, in some cases, eloquent. Simply put, he did not show any signs of a weakened mental or physical condition that would make him in any way vulnerable to aggressive interrogation.

### 2. *Alleged Coercive Conduct.*

Defendant asserts that, by the time he confessed, "physical and psychological pressures employed by law enforcement officers over a time period lasting more than six-and-one-half hours had overridden his free will." (Dkt. No. 130, Def.'s Mem. at 7.) This court disagrees.

Undoubtedly, the interrogation was both lengthy and aggressive. At the suppression hearing, Trooper Mazza explained in detail how he employed a widely used interrogation method often referred to as the "Reid technique."[2] One aspect of this technique involves rebuffing the defendant's denials of guilt. Applying this approach in response to Defendant's denials, at one point during the interrogation Trooper Mazza repeatedly told Defendant "you did it" over fifty times in a span of only a few minutes. (Gov't Ex. 11, Interrogation Tr., 189–90.) Nonetheless, while the questioning was vigorous and persistent, neither Trooper Mazza nor Agent Smythe took any action that could be deemed a constitutionally offensive method of coercion.

▮ Significantly, though Defendant stated he well knew he had the option, he never once expressed a wish to terminate the interrogation, or even to take a break from it. He never said he was tired or ill. In addition, Defendant requested and was granted three cigarette/bathroom breaks. Defendant's age (twenty-four years old) and familiarity with the criminal justice system also weighed against a finding of involuntariness. *See Haley v. Ohio*, 332 U.S. 596, 598, 68 S.Ct. 302, 92 L.Ed. 224 (1948) (holding that defendant's status as a minor supported finding of involuntariness). Other courts have found confessions to be voluntary when produced after much longer questioning of much more vulnerable defendants. *See, e.g., Jackson v. McKee*, 525 F.3d 430, 434 (6th Cir.2008) (ruling that seventeen-year-old defendant's confession was voluntary when he was subjected to noncontinuous interrogation while in custody for forty hours); *Vance v. Bordenkircher*, 692 F.2d 978, 981 (4th Cir. 1982) (intermittent interrogation, over a period of nine hours, of fifteen-year-old defendant with moderate mental deficiency was not coerced because defendant was read his *Miranda* rights, was given breaks

---

**2.** The Reid technique is a trademarked interrogation method developed by the firm of John E. Reid & Associates, Inc.

and food, and never asked for questioning to cease).[3]

Defendant's contention that the investigators coerced him with threats of punishment and promises of leniency are also unavailing. First, Defendant argues that the investigators impermissibly threatened to make Defendant's lack of cooperation known to prosecutors and to the court. Defendant correctly acknowledges that a promise to make cooperation known to the court is not constitutionally suspect. *See United States v. Fera*, 616 F.2d 590, 594 (1st Cir.1980), *cert. denied*, 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980) ("A promise merely to bring any cooperation on the part of the defendant to the prosecuting attorney's attention does not constitute a coercive promise sufficient to render any subsequent statements involuntary and inadmissible."); *United States v. Foley*, 595 F.Supp.2d 171, 178 (D.Mass.2009) (holding that "a promise to bring cooperation to the attention of the prosecutor or the court, without more, is not coercive as a matter of law"). However, Defendant contends that *threatening* to make Defendant's *lack* of cooperation known to the court rises to the level of improper coercion. For evidentiary support, Defendant points to Trooper Mazza's statements that "the court's gonna say no cooperation, no remorse" and "you are the one that ultimately is gonna sit there and pay a . . . much larger premium because you opted just to be yourself and . . . not cooperate." (Gov't Ex. 11, Interrogation Tr., 41, 168.)

Defendant relies on *United States v. Harrison*, 34 F.3d 886 (9th Cir.1994), in which the Ninth Circuit held that "there are no circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor." *Id.* at 891 (emphasis in original). As this excerpt clearly indicates, *Harrison* dealt with the potential impact of such threats on a suspect's invocation of his right to remain silent. Certainly, threatening to punish a suspect for invoking his *Miranda* rights would constitute a violation of the Fifth Amendment. *See id.* at 891; *United States v. Tingle*, 658 F.2d 1332, 1336 n. 5 (9th Cir.1981) ("[A] defendant may not be made to suffer for his silence."); *United States v. DeLaurentiis*, 629 F.Supp.2d 68, 75–76 (D.Me.2009) (finding unconstitutionally coercive threats by DEA agents that "if [defendant] asked for an attorney they would tell the judge [he] was uncooperative").

Here, however, Defendant clearly waived his right to remain silent, both by his conduct and by signing a written statement to that effect.[4] Thus, even if Trooper Mazza's comments could be deemed an implied threat, that threat was directed not at Defendant's invocation of his *Miranda* rights, but at his steadfast refusal to provide honest answers (in Trooper Mazza's eyes) to the investigators' questions.

This distinction is critical. Rather than bullying Defendant into waiving his

---

**3.** It is important to distinguish in this analysis between the issues of whether Defendant spoke voluntarily and whether he spoke truthfully. Defendant undoubtedly lied during his interrogation, either when he was denying guilt or when he was admitting it. Regardless of whether he was lying or telling the truth, Defendant was clearly offering his statements voluntarily, knowingly, and intelligently.

**4.** Defendant also readily admitted at the hearing that he had other reasons for continuing the conversation. For instance, when asked whether he had wanted to shift the blame to other individuals, Defendant responded, "Correct." (Dkt. No. 228, Tr. 2/8/11, 12.) When asked if he had hoped to convince Trooper Mazza that he was not a racist, Defendant responded, "That is very correct." (*Id.*)

*Miranda* rights, Trooper Mazza's statements merely suggested to Defendant that his decision to help or hinder the investigation by being forthcoming or evasive could affect his sentence at a later date. Plainly, Trooper Mazza was alluding to the government's ability to lobby (or not to lobby) the court to depart downward from the sentencing guidelines based upon a defendant's provision of "substantial assistance to authorities." *See* U.S. Sentencing Guidelines Manual § 5K1.1 (2010). Informing a suspect of this intuitive, widely known policy does not constitute coercion. *See United States v. Lee,* 618 F.3d 667, 676–77 (7th Cir.2010) (rejecting defendant's argument that officers improperly coerced him into confessing by, *inter alia,* "threatening to communicate any lack of cooperation to the prosecutor and repeatedly accusing [the defendant] of being a liar"); *United States v. Melnikas,* 929 F.Supp. 276, 282 (S.D.Ohio 1996) (finding that agent's description of "the possible consequences" of not cooperating was constitutionally permissible).

Finally, Defendant asserts that Trooper Mazza engaged in coercive conduct by telling him during a cigarette break that the police would "let [him] go" if he confessed to burning down the Church. (Dkt. No. 224, Tr. 2/3/11, 24.) The suggestion that Trooper Mazza made any such statement is not credible, and the court rejects it. To begin with, it defies credulity to think that Trooper Mazza told Defendant, and that Defendant believed, that confessing to an arson would result in his immediate release from custody. Trooper Mazza denied ever saying anything of this sort, and his testimony was credible. Moreover, even if Trooper Mazza had made such a statement, a false assurance of clemency does not constitute coercion. *See United States v. Byram,* 145 F.3d 405, 408 (1st Cir.1998) ("Given the narrowed definition of coercion in [*Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473

(1986)], it would be very hard to treat as *coercion* a false assurance to a suspect that he was not in danger of prosecution.") (emphasis in original).

In sum, Defendant was not vulnerable to interrogation due to alleged drug withdrawal or otherwise, and the government engaged in no coercive conduct. Therefore, Defendant's confession comported with the Fifth Amendment's requirement of voluntariness.

### C. *Presentment Waiver.*

Defendant concedes that he signed a waiver of his right to prompt presentment at 1:20 a.m., approximately six hours after the interrogation began. However, he contends (1) that he did not do so knowingly, intelligently, and voluntarily; and (2) the waiver was untimely.

#### 1. *Knowing, Intelligent, and Voluntary Waiver.*

For the reasons stated above, this court is not convinced that Defendant's alleged drug withdrawals in any way inhibited his ability to knowingly, intelligently, and voluntarily waive his rights. It must be conceded that the manner in which the presentment waiver took place was not ideal. The relevant portion of the transcript from the interrogation reads as follows:

> [Trooper Mazza]: I need you [to] sign something for me real quick. Come on over here. Sit. (UI) What this is we, we have, we have exceeded or we're, we're approaching a six hour conversation. And I need, cause I want to keep talking to you, okay. And what I need to tell you is this is a waiver. It means I don't have to bring you to court right now. It says you have the right to a prompt arraignment, that is to be brought immediately to be arraigned in front of a Judge if the District Court is in session. Which it's not yet, but it will be open

first thing in the morning. Or if not, at the next session. At such arraignment, an attorney will be appointed and you may be admitted to bail. I understand the right to a prompt arraignment and I wish to talk to you now and waive my right to a prompt arraignment. And that means I want to talk [to] you. We have exceeded six hours and the courts have held that you know holding somebody and talking to somebody for that long, umm, you need to have them sign it so you can just keep talking. If you'd just sign right here.

[Defendant]: So I'm signing for?

[Trooper Mazza]: You're signing that you understand that I just want to keep talking to you and that you're, you, you don't want to be, you don't want the questioning to stop and be brought to court or anything like that, that you're willing to still talk to me . . . It is now, I'm gonna write the date and time down.

(Gov't Ex. 11, Interrogation Tr., 236–37.)

■ The cursory manner in which Trooper Mazza obtained this waiver ("I need you to sign something for me real quick") and Defendant's apparent confusion ("So I'm signing for?") initially gave this court pause. But any concern was entirely dispelled by Defendant's emphatic testimony at the suppression hearing that he fully understood his right to appear before a judge and that he knowingly waived that right. (Dkt. No. 228, Tr. 2/8/11, 3–8.) In fact, when the government repeated each line of the presentment waiver, Defendant acknowledged that he understood each sentence. (*Id.*) Defendant further stated that he had appeared before a judge on criminal matters multiple times in the past. (*Id.*) Finally, Defendant offered a clear, rational explanation for signing the waiver:

My understanding of that waiver was sign the paper and have a chance to continue explaining that I had nothing to do with it, rather than going into court right away and being charged with the crime.

(Dkt. No. 224, Tr. 2/3/11, 17.) Based on the foregoing, it is clear that, despite room for improvement in the way the waiver issue was presented by Trooper Mazza, Defendant's waiver was knowing, intelligent, and voluntary.

2. *Timeliness.*

■ Fed.R.Crim.P. 5(a) requires that a person arrested on a federal charge be presented to a magistrate judge "without unnecessary delay." In *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), the Supreme Court adopted a rule rendering inadmissible any confession (voluntary or involuntary) made during periods of detention that violated the prompt presentment requirement. *Corley v. United States,* 556 U.S. 303, 129 S.Ct. 1558, 1563, 173 L.Ed.2d 443 (2009). Congress's enactment of 18 U.S.C. § 3501 both codified the *McNabb–Mallory* rule and limited its application to delays exceeding six hours. Thus,

a district court presented with a suppression claim must find whether the defendant confessed within six hours of arrest. . . . If the confession occurred before presentment and beyond six hours . . . the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb–Mallory* cases, and if it was, the confession is to be suppressed.

*Corley,* 129 S.Ct. at 1567. The relevant delay may be calculated from the time of arrest by state or local authorities on state charges "if state or local authorities, acting in collusion with federal officers, were to arrest and detain someone in order to allow the federal agents to interrogate him in violation of his right to a prompt federal

presentment." *United States v. Alvarez–Sanchez*, 511 U.S. 350, 359, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994).

Here, Defendant asserts that state authorities acted in collusion with federal authorities, thus requiring the court to calculate the relevant period of time from the point at which he entered state custody—7:16 p.m. The government contends that no collusion took place, and Defendant only entered federal custody after he confessed, thus moving ahead the start-time to approximately 1:45 a.m. The court, however, finds the entire discussion moot.

 Defendant signed the presentment waiver at 1:20 a.m. Even accepting that Defendant was in custody as of 7:16 p.m., the signing of the waiver took place six hours and four minutes later. Notwithstanding Defendant's arguments to the contrary, the delay was not unreasonable or unnecessary under the *McNabb–Mallory* rule. Throughout the interrogation Defendant was willing, indeed eager, to answer questions and interact with the officers. He knew exactly what rights he was waiving and spoke entirely voluntarily. The very modest time that the presentment waiver exceeded the six-hour limit, and the fact that no courthouse was open at that time, make the negligible delay neither unreasonable nor unnecessary. As such, the time period involved was constitutionally insignificant, and the waiver was valid.

As a final note, the court also finds unpersuasive Defendant's argument that he waived only his *state* right to prompt presentment, not his *federal* right. First, Defendant has failed to identify any substantive distinction between the two rights. Of course, Defendant himself never raised such a distinction while being interrogated, and the waiver itself did not highlight one. Furthermore, even if the court were to accept Defendant's argument that the written waiver only applied to his rights under state law, Defendant clearly indicated his willingness to continue talking to the interrogating officers, and the law does not require an express written waiver of rights. *See North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case.").[5]

### D. *Motion for Reconsideration.*

Defendant moved for reconsideration of the court's initial ruling on the motion to suppress, on the grounds that the court issued its ruling before counsel had a chance to submit a supplemental memorandum. (Dkt. No. 237.) Because the parties had already fully briefed the issues, and no supplementation could affect the court's ruling, the motion for reconsideration was denied.

### IV. *CONCLUSION*

For the foregoing reasons, Defendant's Motion to Suppress (Dkt. No. 129) and

---

**5.** As to Defendant's argument that he was deprived of a timely phone call, the transcript is not clear that he ever unequivocally requested one. Moreover, this argument relies upon a requirement of state law, not federal law. *See* Mass. Gen. Laws ch. 276, § 33A (requiring that an arrestee "shall be informed forthwith upon his arrival at [a place of detention] of his right to so use the telephone, and such use shall be permitted within one hour thereafter"). Even under state law, the requirement only applies to formal arrests, not custodial interrogations. *See Commonwealth v. Rivera*, 441 Mass. 358, 805 N.E.2d 942, 955–56 (2004).

Motion for Reconsideration (Dkt. No. 237) were DENIED.

It is So Ordered.